2008 UT 35

**Lisa BYBEE, Plaintiff and Appellee,**

v.

**Alan ABDULLA, M.D., and John Does 1–5, Defendants and Appellants.**

No. 20060424.

Supreme Court of Utah.

June 3, 2008.

James R. Hasenyager, Peter W. Summerill, Ogden, for plaintiff.

Brian P. Miller, Kenneth L. Reich, Salt Lake City, for defendants.

Elliott J. Williams, Kurt M. Frankenburg, Stephen T. Hester, Mark A. Brinton, Salt Lake City, for amicus Utah Medical Ass'n; Roger H. Hoole, Todd Wahlquist, Salt Lake City, for amicus Utah Trial Lawyers Ass'n.

NEHRING, Justice:

## INTRODUCTION

¶ 1 Lisa Bybee filed a wrongful death action against Dr. Alan Abdulla, alleging that his negligent care caused her husband, Mark Bybee, to commit suicide. Because Mr. Bybee had entered into an arbitration agreement, Dr. Abdulla filed a motion to enforce the agreement and to compel Mrs. Bybee to arbitrate her wrongful death claim. The district court denied the motion, and Dr. Abdulla appealed. We affirm.

## BACKGROUND

¶ 2 Lisa Bybee's husband, Mark Bybee, was a patient of Dr. Alan Abdulla. Following what Mrs. Bybee described as "a major depression," Mr. Bybee committed suicide. Mrs. Bybee brought a wrongful death action against Dr. Abdulla and five other defendants, alleging that their medical malpractice caused Mr. Bybee's death. In her complaint, she alleged that Dr. Abdulla, who previously treated Mr. Bybee for allergies and had no expertise in diagnosing or treating depression, prescribed Mr. Bybee antidepressant medicine and later renewed the prescription, increasing the dose. Mrs. Bybee alleged that Dr. Abdulla's failure to reevaluate Mr. Bybee's depression and his response to the medicine before increasing the dose or continuing to prescribe the medicine fell below the standard of care of a reasonable physician. She alleged that Dr. Abdulla's substandard care was the cause of her husband's suicide. Mrs. Bybee and the heirs of Mr.

Bybee sought damages for the loss of love, care, society, consortium, financial support, and inheritance of Mr. Bybee, and Mrs. Bybee and the estate of Mr. Bybee sought damages for the medical and funeral expenses of Mr. Bybee.

¶ 3 Dr. Abdulla moved to stay the district court action and to compel arbitration. The request to compel arbitration was based on an arbitration agreement signed by Mr. Bybee, which read:

> Article 1: *Agreement to Arbitrate:* We hereby agree to submit to binding arbitration all disputes and claims for damages of any kind for injuries and losses arising from the medical care rendered or which should have been rendered after the date of this Agreement. All claims for monetary damages against the physician, and the physician's partners, associates, association, corporation or partnership, and the employees, agents and estates of any of them (hereinafter collectively referred to as "Physician"), must be arbitrated including, without limitation claims for personal injury, loss of consortium, wrongful death, emotional distress or punitive damages. We agree that the Physician may pursue a legal action to collect any fee from the patient and doing so shall not waive the Physician's right to compel arbitration of any malpractice claim. However, following the assertion of any malpractice claim against the Physician, any fee dispute, whether or not the subject of any existing legal action, shall also be resolved by arbitration.
>
> We expressly intend that this Agreement shall bind all persons whose claims for injuries and losses arise out of medical care rendered or which should have been rendered by Physician after the date of this Agreement, including any spouse or heirs of the patient and any children, whether born or unborn at the time of the occurrence giving rise to any claim (hereinafter collectively referred to as "Patient").

¶ 4 Dr. Abdulla argued that an arbitration agreement could bind heirs because Utah Code section 78B–3–421(1)(b)(vii)(C) (Supp. 2008)[1] permits an arbitration agreement to apply to third parties whose claims arise solely out of the injury sustained by the patient who signed the agreement. Although Mr. Bybee's claim arose before the statute expressly allowed third parties to be bound by arbitration agreements,[2] Dr. Abdulla argued that the change was merely procedural and should be applied retroactively. He also argued that Mrs. Bybee should be required to arbitrate because Mr. Bybee signed the agreement as her agent or, alternatively, because she was a third-party beneficiary of the contract.

¶ 5 Mrs. Bybee urged the district court not to compel arbitration, arguing that she should not be bound to a contract she did not sign and that the version of section 78B–3–421 in effect when the claim arose did not expressly allow arbitration agreements to bind third parties. Additionally, Mrs. Bybee argued that even if the current version of section 78B–3–421 applied, it could not modify Mrs. Bybee's constitutional right to pursue her wrongful death suit in court because a wrongful death claim is not based solely on an injury sustained by the patient but is, instead, a cause of action based on injury to the heirs of the decedent.

¶ 6 The district court denied Dr. Abdulla's motion to compel, holding that the changes to section 78B–3–421 were not procedural and should not be applied retroactively. The district court held that since Mrs. Bybee did not sign the arbitration agreement, she was not bound by it and that she could not be bound under an agency or third-party beneficiary theory. Utah law has designated as appealable orders denying arbitration although they are not final orders. *Id.* § 78B–11–129. We have jurisdiction over this appeal pursuant to this provision and from Utah Code section 78A–3–102(3)(j).

---

1. The Legislature renumbered Title 78 during the 2008 general legislative session. The language of the statute in Title 78 did not change; therefore, we cite to the newly numbered statute.

2. The Utah Medical Malpractice Act was amended in 2004, at which time subsection (1)(b)(vii)(C) was added to section 78B–3–421.

## STANDARD OF REVIEW

¶ 7 Whether a contract requires a party to arbitrate is a question of law, which we review for correctness. *See Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 478 (Utah 1986).

## ANALYSIS

¶ 8 Most contracts bind only those who bargain for them, *see Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah 1998) (citing Restatement (Second) of Contracts § 17(1) (1981)), and "the burden of proof for showing the parties' mutual assent as to all material terms and conditions is on the party claiming that there is a contract," *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995). Arbitration agreements are not exempt from this rule. Arbitration is an alternative to judicial resolution of disputes in which participation is voluntary. Thus, absent the presence of some intervening circumstance, a party cannot be compelled to surrender his right to seek a remedy or defend himself in court. Even our strong public policy favoring arbitration, *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 16, 40 P.3d 599, is insufficient, standing alone, to justify forcing an unwilling party to submit to arbitration.

¶ 9 Nevertheless, the law recognizes circumstances in which a party who never expressly consented to arbitrate a dispute may surrender his right to go to court. *See, e.g., Am. Express Travel Related Servs. Co. v. Am. Fine Art & Frame Co.*, 2004 WL 1144103, 2004 U.S. Dist. LEXIS 9217 (D.Tex. May 20, 2004); *Matthau v. Superior Court*, 151 Cal.App.4th 593, 60 Cal.Rptr.3d 93 (Ct. App.2007); *Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, 148 P.3d 983.

¶ 10 Dr. Abdulla proposes four reasons that merit our consideration for why we should require Mrs. Bybee to comply with the terms of a contract she did not sign. First, he argues that Mr. Bybee was the "master of his own claim" and that he therefore had unfettered authority to do anything he chose with his claim, including requiring his widow to arbitrate her own separate wrongful death claim. Dr. Abdulla's second line of reasoning is closely related to the first. Noting that we have allowed certain defenses that could have been asserted against the decedent in his personal injury action to be raised against heirs in a wrongful death action, Dr. Abdulla would have us add the defense of the arbitration agreement to that list. Third, he points to the 2004 amendments to the Utah Medical Malpractice Act that permit enforcement of arbitration against nonsignatories and contends that these statutory provisions should be applied retroactively to Mr. Bybee's arbitration agreement. Finally, Dr. Abdulla claims that the arbitration agreement binds Mrs. Bybee because she was its intended third-party beneficiary. We will speak to each of these arguments, starting with the first.

## I. A PERSONAL INJURY PLAINTIFF IS THE "MASTER OF HIS OWN CLAIM" BUT SUBJECT TO CONSTRAINTS ON HIS POWER TO EXERCISE HIS MASTERY

¶ 11 Dr. Abdulla's oft-repeated credo in this appeal is that Mr. Bybee was the "master of his own claim." According to Dr. Abdulla, Mr. Bybee's mastery over his claim was boundless and, since it endured after his death, timeless. The "master of his own claim" image is one that Dr. Abdulla borrowed from our case, *Jensen v. IHC Hospitals, Inc.*, and which we, in turn, extracted from *Prosser and Keeton on the Law of Torts.* 944 P.2d 327, 332 (Utah 1997).

¶ 12 In *Jensen*, we used the concept of claim mastery as a rhetorical fillip to bolster our holding that the statute of limitations for the wrongful death of a decedent whose death allegedly resulted from medical malpractice was the limitation period found in the Utah Health Care Malpractice Act, which is now codified at Utah Code section 78B–3–404, and not the statute of limitations for wrongful death actions. 944 P.2d at 332. Dr. Abdulla reasons that if a decedent could, through his inaction, exercise mastery over his claim to cut off a wrongful death cause of action, he must certainly be capable of making the conscious decision to require that his heirs arbitrate their wrongful death claim.

¶ 13 Dr. Abdulla's reasoning places demands on the mastery of claim rhetoric that it cannot deliver, and we reject it. There are two reasons for this. First, our use of the "master of his own claim" language in *Jensen* was limited in its scope and, upon a closer examination of the context in which it was used in Prosser and Keeton's treatise, we appear to have applied the phrase to make a point with which Prosser and Keeton directly disagreed. Second, as a constitutionally recognized cause of action, wrongful death is not wholly subservient to the mastery of the decedent.

¶ 14 In *Jensen*, we listed several justifications for measuring the time available to bring a wrongful death action by the statute of limitations that applied to the underlying wrong done to the decedent. Our dominant rationale was a logical one. It began by observing that a majority of states hold that a decedent who has settled his personal injury case or seen his claim terminated by a judgment extinguishes an heir's wrongful death cause of action.[3] *Jensen*, 944 P.2d at 332. We then reasoned that the running of a statute of limitations has the same functional effect on a personal injury claim as a settlement or a judgment. *Id.* Therefore, we concluded that the statute of limitations applicable to the underlying personal injury action should govern the fate of the wrongful death claim. *Id.* Finally, we tied our reasoning to the public policy underlying statutes of limitations, defending our ruling as consistent with the laudable policy of discouraging the prosecution of stale claims. *Id.*

¶ 15 We turned to Prosser and Keeton's "master of his own claim" phrase to lend authoritative support to our major premise that a wrongful death claim cannot coexist with a suit brought on the underlying personal injury. Tellingly, Prosser and Keeton do not make much of their master of the claim imagery. It served only to provide a colorful description of the consequences to an heir's wrongful death cause of action of a decedent's decision to sue for personal injury. W. Page Keeton et al., *Prosser and Keeton*

*on the Law of Torts* § 127, at 955 (5th ed.1984). Indeed, they note that it was a concern for the possibility of double recovery, not some inherent authority vested in the master of the claim, that led courts to bar a wrongful death action after a personal injury judgment or settlement. *Id.* Still more noteworthy, Prosser and Keeton reject our assumption that because a majority of states bar wrongful death claims initiated after a judgment or settlement of the underlying personal injury action, that wrongful death actions should also be cut off when the statute of limitations on the underlying tort has run. *Id.* at 957–58. Noting that choice of statutes of limitations does not involve the danger of double recovery, Prosser and Keeton tally a "considerable majority" of courts to have taken the opposite position of that which we adopted in *Jensen*. *Id.* Those courts held that wrongful death actions are governed by the wrongful death statute of limitations and not the limitations period of the underlying claim. *Id.* If the master of the claim credo were indeed the principle guiding the interaction between wrongful death claims and their related personal injury actions, no case or commentator we are aware of has suggested as much.

¶ 16 Because the use of the master of claim concept in *Jensen* was limited to supporting the premise that a wrongful death action cannot be brought if the decedent settled, won, or lost his claim before dying and because the concept is not used in analyzing other questions concerning wrongful death claims, we will not extend the concept beyond its supporting role.

¶ 17 Our rejection of the master of the claim rhetoric as justification for permitting an injured person to control the rights of a wrongful death claim also has a constitutional dimension. We could not cede sweeping authority to an injured person under the master of the claim rubric without compromising the right guaranteed by article XVI, section 5 of the Utah Constitution. This provision confers special status on the cause of action for wrongful death, stating, "The right of

---

**3.** We have never expressly held that the settlement or entry of judgment in a personal injury action bars a wrongful death claim. By contrast,

Utah's survival statute, section 78B–3–107, makes clear that it does not apply to claims that have been settled or adjudicated.

action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law." Utah Const. art. XVI, § 5.

¶ 18 We have recounted the statutory and constitutional history of Utah's wrongful death cause of action before [4] and return to it here only to underscore that wrongful death occupies a position of privilege among torts. Although, from before the Norman Conquest, the accidental killing of a human being imposed on the wrongdoer a duty to pay compensation, English common law changed course in 1808. Keeton et al., *supra* ¶ 15, § 127, at 945. In that year, a British court concluded that death was not an "injury" and that a widower could not recover for the loss of his wife's services. *Id.* Dissatisfaction with a rule that made it more attractive to a tortfeasor to kill a victim than to injure him led to the enactment of the Lord Campbell's Act in 1846. *Id.* The wrongful death cause of action entered Utah territorial law in 1874 and was incorporated into the Utah Constitution when Utah entered the Union. *Jones v. Carvell*, 641 P.2d 105, 107 (Utah 1982). By 1970, every state had enacted some form of protection for wrongful death claims. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 390, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). In 1895, however, when the drafters of the Utah Constitution were at work, the status of the wrongful death cause of action among the forty-four states remained equivocal. *Jones*, 641 P.2d at 107. Despite the absence of discussion or debate about article XVI, section 5 in the Journal of Constitutional Proceedings, we have attributed the incorporation of the wrongful death cause of action into our constitution to the perceived importance of the right and to a desire to remove any uncertainty in our state about its viability. *Id.* Also, constitutional protection of the right serves to set it apart from the unsettled status of the right to recover for wrongful death elsewhere. *Id.*

¶ 19 We have previously acknowledged that the wrongful death action's constitutional status entitles it to special protection against attempts to pare back its scope. In *Berry v. Beech Aircraft Corp.*, we interpreted article I, section 11 of the Utah Constitution, known commonly as the open courts clause, to restrict the Legislature's prerogative to abrogate causes of action or their remedies. 717 P.2d 670, 680 (Utah 1985). We held that the Legislature could alter or abolish most causes of action so long as it provided a "reasonable alternative remedy" or if the legislative action was shown to be a reasonable way to eliminate "a clear social or economic evil." *Id.* We observed that owing to its constitutional status, the right protected by article XVI, section 5 entitles it to "a particularized application of the open courts provision," one not susceptible to legislative encroachment even under circumstances that would satisfy the conditions under which *Berry* would permit the elimination or limitation of other causes of action or their remedies. *Id.* at 683. *Berry's* treatment of article XVI, section 5 is both consistent with and made inevitable by our pre-*Berry* pronouncement that the provision "was directed at preventing the Legislature from abolishing a right of action for wrongful death, whether in a wholesale or piecemeal fashion." *Malan v. Lewis*, 693 P.2d 661, 667 (Utah 1984) (citing *Oliveras v. Caribou–Four Corners, Inc.*, 598 P.2d 1320 (Utah 1979); *Garfield Smelting v. Indus. Comm'n*, 53 Utah 133, 178 P. 57 (1918)).

¶ 20 Dr. Abdulla argues that his arbitration agreement with Mr. Bybee merely imposes a "reasonable procedure" on Mrs. Bybee and not a piecemeal abrogation of Mrs. Bybee's constitutionally protected claim. We disagree. We harbor serious doubts that a statute purporting to empower a person to bind an heir to arbitrate a wrongful death claim could coexist with article XVI, section 5. We need not confront that issue here, however, because as our discussion to follow will explain, the Legislature has yet to enact such a statute. We turn to article XVI, section 5 of the Utah Constitution in this

---

4. *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985); *Jones v. Carvell*, 641 P.2d 105 (Utah 1982).

setting not to pass judgment on a statute, but rather to invoke its authority to invalidate the contract through which Mr. Bybee sought to compel Mrs. Bybee to arbitrate her wrongful death claim.

## II. NOT EVERY DEFENSE THAT COULD HAVE BEEN RAISED AGAINST A DECEDENT MAY BE RAISED AGAINST THE HEIRS, AND MR. BYBEE'S ARBITRATION AGREEMENT IS ONE OF THEM

¶ 21 We need not renounce our holding in *Jensen* to distance ourselves from Dr. Abdulla's contention that by inserting the "master of his own claim" language into our decision we must therefore accept his conclusion that an arbitration agreement can be asserted as a defense against Mrs. Bybee in her wrongful death action. This is because in *Jensen* we granted injured persons a more modest array of powers to bind their heirs should their death give rise to a wrongful death action. A wrongful death plaintiff is not exposed to all of the defendant's defenses, but rather is "subject to at least some of the defenses that would have been available against the decedent had she lived to maintain her own action." *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 332 (Utah 1997). The addition of the statute of limitations defense recognized in *Jensen* brought to two—the other was comparative negligence, *Kelson v. Salt Lake County*, 784 P.2d 1152, 1155 (Utah 1989)—the number of defenses that a potential tortfeasor may transfer from a decedent to an heir. We have never intended to suggest, however, that because a decedent is the master of his claim he may by contract expose his unwilling heirs to any imaginable defense.

¶ 22 The master of his claim notion owes much of its appeal to the assumption that since the wrongful death cause of action cannot be maintained in the absence of a viable underlying personal injury claim, its every dimension is under the control of the injured person whose death gives rise to the wrongful death claim. Thus, the decedent is the master of his claim because his heirs "stand in the shoes" that shod the decedent while he was alive.

¶ 23 Courts that compel nonsignatory heirs to abide by arbitration agreements often do so because under their law a wrongful death cause of action is wholly derivative of and dependent on the underlying personal injury claim. This was the case in *Ballard v. Southwest Detroit Hospital*, 119 Mich.App. 814, 327 N.W.2d 370, 371–72 (1982), cited by Dr. Abdulla. The *Ballard* court said this about Michigan's wrongful death statute: "Although the Michigan wrongful death act provides for additional damages benefitting the decedent's next of kin for loss of society and companionship, it does not create a separate cause of action independent of the underlying rights of the decedent." *Id.* This assessment echoed the Michigan Supreme Court's pronouncement that "[t]he act clearly provides not that death creates a cause of action, but that death does not extinguish an otherwise valid cause of action." *Hardy v. Maxheimer*, 429 Mich. 422, 416 N.W.2d 299, 307 n. 17 (1987). Unlike Utah, Michigan has not chosen to grant its wrongful death cause of action a place in its state constitution. Unlike Michigan, Utah has uniformly held that a wrongful death cause of action, while derivative in the sense that it will not lie without a viable underlying personal injury claim, is a separate claim that comes into existence upon the death of the injured person. *Meads v. Dibblee*, 10 Utah 2d 229, 350 P.2d 853, 855 (1960); *Halling v. Indus. Comm'n*, 71 Utah 112, 263 P. 78, 81 (1927). The independent nature of the wrongful death cause of action in Utah means that in our state the heirs in a wrongful death action stand in, at most, one shoe of the decedent. The example of Michigan's approach to wrongful death leaves us wary of relying on cases from states whose wrongful death statutes deviate from ours or which have not elevated their wrongful death causes of action to constitutional status. To be skeptical of joining with the courts of sister states that have adopted wrongful death causes of action marked by excessive vulnerability to defenses created by the decedent is to honor the drafters of the Utah Constitution, whose restiveness about the questionable commitment shown by other states to a robust wrongful death cause of action motivated them to place article XVI, section 5 in our state's charter.

¶ 24 While we have pointed out that our cases do not mandate that wrongful death plaintiffs fend off every defense that a tortfeasor could have asserted against the decedent and how wrongful death's constitutional status shields heirs from defenses that might otherwise have impeded their claim, we have not explained how to distinguish defenses that may be raised against wrongful death plaintiffs from those that may not. A case cited by Dr. Abdulla to support his cause aids us in this task. Dr. Abdulla directs us to *Hirpa v. IHC Hospitals, Inc.*, 948 P.2d 785 (Utah 1997), for the proposition that, notwithstanding *Berry*, we have displayed a willingness to enforce statutes that affect the rights of wrongful death litigants. In *Hirpa*, we permitted an emergency room physician to use Utah's Good Samaritan Act as a defense against a wrongful death claim. *Id.* at 794. This did not amount to an unconstitutional assault on the wrongful death cause of action because, as *Berry* noted, " 'the Legislature may enact reasonable procedures for the enforcement of wrongful death actions and may provide for reasonable defenses that are not inconsistent with the fundamental nature of the wrongful death action itself.' " *Id.* (quoting *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 685 (Utah 1985)). Although we did not conduct a searching inquiry into why a defense based in the Good Samaritan Act was compatible with a wrongful death action, it is clear that the defenses created by the Act share with comparative negligence, *Kelson*, 784 P.2d at 1155, and statutes of limitations, *Jensen*, 944 P.2d at 332, a key common characteristic. Both defenses go to the viability of the underlying personal injury action. By contrast, an agreement to bind heirs to arbitrate disputes does not implicate the viability of the underlying claim. *Horwich v. Superior Court*, 21 Cal.4th 272, 87 Cal.Rptr.2d 222, 980 P.2d 927, 935 (1999).

¶ 25 While we are wary of announcing a categorical rule to distinguish between defenses that a decedent may successfully confer by contract on a defendant to assert against heirs in a wrongful death action, those least likely to be found enforceable are contract provisions that purport to affect the rights of heirs but do not affect the existence of the decedent's personal injury claim during his lifetime. The arbitration agreement between Dr. Abdulla and Mr. Bybee falls squarely within this category and is therefore unenforceable against the heirs.

## III. NEITHER STATUTES NOR EXPRESSIONS OF PUBLIC POLICY FAVORING ARBITRATION PLAY A ROLE IN DETERMINING WHETHER MRS. BYBEE CAN BE COMPELLED TO ARBITRATE

¶ 26 For a dispute to be subject to arbitration, an agreement to arbitrate must exist that binds the party whose submission to arbitration is sought, *Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, ¶ 14, 148 P.3d 983, and the dispute to be arbitrated must fall within the scope of the agreement, *Buckner v. Kennard*, 2004 UT 78, ¶ 18, 99 P.3d 842.

¶ 27 Both Dr. Abdulla and amicus Utah Medical Association cite many sources for the proposition that the law promotes arbitration and that the law resolves ambiguities in favor of arbitration. We have no quarrel with these presumptions but conclude that "[w]hile there is a presumption in favor of arbitration, that presumption applies only when arbitration is a bargained-for remedy of the parties" as evidenced by "direct and specific evidence" of a contract to arbitrate. *Ellsworth*, 2006 UT 77, ¶ 14, 148 P.3d 983 (citation and internal quotation marks omitted). Absent a statute governing arbitration agreements, the fact that a contract contains an arbitration provision does not influence the threshold issue of who is bound by the contract terms.

¶ 28 Dr. Abdulla and the UMA share the view that the Legislature's enactment of the Utah Uniform Arbitration Act—codified at Title 78B, Chapter 11 of the Utah Code—and the Utah Health Care Malpractice Act—codified at Title 78B, Chapter 3, Part 4 of the Utah Code—either "anticipate" that nonsignatories be bound by arbitration agreements or, in the case of the UMA, assert that they expressly mandate enforcement against nonsignatories.

¶ 29 We may dispatch Dr. Abdulla's reliance on the Utah Arbitration Act in short

order. Dr. Abdulla correctly observes that the Arbitration Act expressly authorizes arbitration agreements to govern future disputes. Utah Code Ann. § 78B–11–107 (Supp.2008). There is nothing in the Arbitration Act, however, that can be construed to extend its endorsement to future controversies involving strangers to the agreement. *Who* can be bound by an arbitration agreement is a question that cannot be answered by a provision in a statute explaining *what* may be arbitrated.

¶ 30 We next turn to the Utah Medical Malpractice Act. At the time Mr. Bybee signed the arbitration agreement, the Malpractice Act included an arbitration provision that was silent on whether a patient could bind an heir who had not signed an agreement to arbitrate a claim against a health care provider. In 2004, the Legislature amended the Act to mandate that arbitration agreements require arbitration of "the claim of a person who is not a party to the contract if the sole basis for the claim is an injury sustained by [a person who signed the agreement in a personal or representative capacity]." *Id.* § 78B–3–421(1)(b)(vii)(C).[5]

¶ 31 Dr. Abdulla asserts that his arbitration agreement with Mr. Bybee, although signed in 2003, should be governed by the 2004 amendment because it was intended to be a clarification of earlier law and not a substantive change to it. We conclude that the 2004 amendment does not include within its reach wrongful death claims. Moreover, to the extent that Dr. Abdulla's characterization of the 2004 amendment as a "clarification" of prior law is correct, the point the amendment clarified was that arbitration agreements subject to the Act cannot bind *all* nonsignatories.

¶ 32 Arbitration agreements subject to the 2004 amendment can bind a nonsignatory only if the "sole basis for the claim is an injury sustained by [the patient]." *Id.* As discussed above in Part II, in Utah, a wrongful death cause of action has two anchors:

the injury sustained by the decedent and the separate and independent interests of the heir in whom the claim vests. Both qualify as a "basis" for a wrongful death claim. The constitutional pedigree conferred on a wrongful death cause of action, making it in part an action based on injury to the heirs, amounts to enough to remove it from consideration as "solely" arising from the injury sustained by the person who signed the agreement.

¶ 33 Buttressing this view is the contrast between the two provisions of Utah law that extend to an heir the right to recover damages following the death of another: the survival statute, codified in section 78B–3–107; and the wrongful death provisions, found at section 78B–3–102 and section 78B–3–106. With its enactment of the survival statute, the Legislature codified the principle that the death of an injured person does not exonerate a tortfeasor from liability for damages even if the death was unrelated to the wrongful act of the tortfeasor. In such a case, heirs may recover on behalf of the decedent certain special damages, but may not recover for the pain and suffering of the decedent and similar components of recovery falling within the category of general damages. The survival statute confers standing on heirs but limits what they can recover. The amendments to the statute were designed to address the problem that arose when a person was injured by a tortfeasor, incurred substantial costs for treatment of the injury, and later died from a different cause. Prior to the amendment, the decedent's action against the tortfeasor died with him, yet his estate was still obligated to pay his medical bills. The amendment was designed to address this injustice but only to the extent of allowing the heirs to seek compensation from the tortfeasor for special damages. Scott Daniels, *A Primer on Damages Under the Utah Wrongful Death and Survival Statutes*, 1974 Utah L.Rev. 519, 533–34 (1974) (citing Utah H.R. Jour., 37th Sess. 27 (1967)). The restrictions imposed

---

5. The language of the Act appears to make the application of arbitration agreements to nonsignatory claimants by incorporating language stating in its relevant portions that "the agreement shall require that ... the agreement only apply to: ... the claim of a person who is not a party to the contract if the sole basis for the claim is an injury sustained by a person described in Subsection (1)(b)(vii)(B)." These provisions reasonably could be read to mandate that arbitration agreements include the terms that they "only apply to."

by the statute on the range of damages available under the survival statute are consistent with an intention to limit the recovery of a decedent's heirs to those damages sustained by the decedent during his lifetime that did not require the testimony of the decedent to ascertain. *Id.* at 534–35. Unlike the cause of action for wrongful death, however, the survival statute does not confer on heirs a right to recover any damages based on injury sustained by them due to the death of the decedent.

¶ 34 Although we are not called upon to decide whether section 78B–3–421 would bind nonsignatory heirs to arbitrate survivor claims, by so clearly describing an heir's claim as one with its "sole basis" in the injury of the decedent, the text of section 78B–3–421 distinguishes the claims to which it applies from the wrongful death cause of action and describes the claims in terms similar to those which could be brought under the survivor statute. Claims that could be brought under the survivor statute, unlike those available under the wrongful death cause of action, are based only on special damages that would have been available to the decedent. In contrast, in a wrongful death action the expansive scope of damages available extends well beyond what is permitted by the survivor statute and honors the separate and exceptional value our society places on familial relationships. If, then, Dr. Abdulla's arbitration agreement is to bind Mrs. Bybee, it cannot be because the 2004 amendment to section 78B–3–421 of the Medical Malpractice Act mandates it.

## IV. MRS. BYBEE WAS NOT AN INTENDED BENEFICIARY OF THE ARBITRATION AGREEMENT

¶ 35 We have defined third-party beneficiaries to a contract as those "recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 506 (Utah 1980) (internal quotation marks omitted). Third-party beneficiary litigation is typically prosecuted by one who is asserting her status as a third-party beneficiary to claim the benefit of some right for which she did not expressly bargain. This case is atypical. Mrs. Bybee would be an unwilling third-party beneficiary. She does not desire to arbitrate her wrongful death cause of action and does not perceive the arbitration agreement's attempt to strip her of her right to prosecute her claim in court as a "benefit." The district court did not apprehend Dr. Abdulla's attempt to restrict Mrs. Bybee's choice of forum as a benefit, nor do we.

¶ 36 The benefits conferred by contracts are presumed to flow exclusively to the parties who sign the contracts. *Tracy Collins Bank & Trust v. Dickamore*, 652 P.2d 1314, 1315–16 (Utah 1982) (citing Restatement (Second) of Contracts § 302 (1981)). A third party may claim a contract benefit only if the parties to the contract clearly express an intention "to confer a separate and distinct benefit" on the third party. *Rio Algom*, 618 P.2d at 506. The arbitration agreement signed by Mr. Bybee states that he and Dr. Abdulla "expressly intend that this Arbitration Agreement shall bind all persons whose claims for injuries and losses arise out of medical care rendered or which should have been rendered by [Dr. Abdulla] after the date of this Agreement, including any spouse or heirs." While the intention to bind Mrs. Bybee is clear, it is less apparent that the obligation to arbitrate was a "separate and distinct benefit" bestowed by her husband and Dr. Abdulla on her.[6]

¶ 37 Dr. Abdulla contends, however, that it is irrelevant that Mrs. Bybee found her pur-

---

**6.** Counsel for amicus Utah Medical Association insisted that in the realm of medical malpractice, plaintiffs have found arbitration to be an attractive alternative to litigation, implying that plaintiffs have nothing to fear by choosing to forego the civil justice system. Scholarly evidence suggests otherwise. Although arbitration is often touted as a quicker, less expensive alternative to litigation that benefits both plaintiffs and defendants, recent research indicates that the benefits of arbitration are not as equally distributed as assumed. *See, e.g.,* Theodore Eisenberg et al., *Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts,* __ U. Mich. J. of L. (forthcoming 2008) *available at* http://ssrn.com/abstract=1076968 (presenting data demonstrating that in the corporate context, "firms generally shun arbitration except against consumers and employees" and companies "consistently chose arbitration as the method for resolving disputes

ported obligation to arbitrate to be of no benefit to her. He insists that the arbitration agreement was but one element of the greater physician-patient contractual relationship from which Mrs. Bybee's wrongful death claim flowed. Dr. Abdulla does not explain, however, what separate and distinct benefits the broader physician-patient relationship was intended to bestow on Mrs. Bybee. To be sure, Mrs. Bybee desired that her husband's health be restored as a result of his treatment by Dr. Abdulla. She also almost certainly would have considered herself to be a beneficiary of her husband's good health. The benefits Mrs. Bybee would have derived from her husband's return to health would, however, have been incidental to the physician-patient relationship. The only intended beneficiary of the contract for medical services between Dr. Abdulla and Mr. Bybee was the patient, Mr. Bybee. As what was, at most, an incidental beneficiary of her husband's medical treatment, Mrs. Bybee acquired no rights based on Mr. Bybee's physician-patient relationship with Dr. Abdulla. *See, e.g., Mel Trimble Real Estate v. Fitzgerald,* 626 P.2d 453, 454–55 (Utah 1981) (holding that "one incidentally benefitted by the performance of a promise to a third person may not maintain an action against the promisor").

¶ 38 Courts typically invoke the doctrine of estoppel to compel a third-party beneficiary of a contract to arbitrate a claim he seeks to pursue that arises from the contract containing the arbitration clause. *S. Ill. Beverage, Inc. v. Hansen Beverage Co.,* No. 07–cv–391–DRH, 2007 WL 3046273, 2007 U.S. Dist. LEXIS 76229 (S.D.Ill. Oct. 15, 2007). It would be inequitable to do otherwise because the nonsignatory is attempting to benefit from the provisions of the contract that requires arbitration. By invoking estoppel, a court may prohibit a party from repudiating an arbitration clause it perceives to be disadvantageous while exploiting favorable contract terms. *Hughes Masonry Co. v.*

*Greater Clark County Sch. Bldg. Corp.,* 659 F.2d 836 (7th Cir.1981); *Amoco Transp. Co. v. Bugsier Reederei & Bergungs, A.G. (In re Oil Spill by the "Amoco Cadiz"),* 659 F.2d 789 (7th Cir.1981). In keeping with the requirement that an intended third-party beneficiary *directly* benefit from the contract, the presence of an arbitration clause in a contract that does not directly benefit a litigant cannot estop him from proceeding in court. *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779–80 (2d Cir.1995).

¶ 39 Only the patient is the direct beneficiary of a contract between a physician and the patient. That Dr. Abdulla would, therefore, be unable to sustain a claim that Mrs. Bybee should be estopped from avoiding arbitrating her wrongful death claim reinforces our conclusion that she was not an intended third-party beneficiary.

### CONCLUSION

¶ 40 We hold that the district court's denial of Dr. Abdulla's motion to compel arbitration was correct because a decedent does not have the power to contract away the wrongful death action of his heirs and because in a wrongful death action by heirs, arbitration does not fall into the category of defenses that can be raised because they were available against the decedent. Furthermore, neither section 78B–3–421 nor public policy favoring arbitration mandate that Mrs. Bybee be bound to arbitrate. Finally, Mrs. Bybee cannot be required to arbitrate because she is not a third-party beneficiary. We therefore affirm the order of the district court denying Dr. Abdulla's motion to compel arbitration.

¶ 41 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.

---

with consumers, but seldom opted for arbitration in material contracts negotiated with other parties"). Additionally, other commentators have pointed out that in some instances, because they are selected by the parties, arbitrators may tend to avoid penalizing an organization in order to

earn their repeated business. *See* James R. Holbrook, *Mandatory Binding Arbitration of Medical Malpractice Claims in Utah,* 16 Utah Bar J. 8 (2003). Furthermore, because a plaintiff must pay a portion of the arbitrators' fees, arbitration may be more costly for plaintiffs. *Id.*