**2020 UT App 177**

# THE UTAH COURT OF APPEALS

M.A.,
Appellant,
*v.*
REGENCE BLUECROSS BLUESHIELD OF UTAH,
Appellee.

Opinion
No. 20190885-CA
Filed December 31, 2020

Third District Court, Tooele Department
The Honorable Matthew Bates
No. 180301744

Sara Pfrommer and Kathleen M. McConkie,
Attorneys for Appellant

Timothy C. Houpt and Jessica P. Wilde,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

ORME, Judge:

¶1     Regence BlueCross BlueShield of Utah (Regence) denied insurance coverage for a two-week biofeedback retraining program to treat M.A.'s chronic constipation. Following three internal appeals, in which Regence upheld its denial of coverage for the treatment, M.A. sued Regence alleging, in relevant part, breach of the implied covenant of good faith and fair dealing. The district court granted summary judgment in Regence's favor. M.A. appeals, and we affirm.

BACKGROUND[1]

¶2      M.A. is a beneficiary of a self-funded group health plan that her husband's employer, Granite School District, sponsors. The school district engaged Regence to act as the administrator of the plan. An administrative services contract (the ASC) governs the relationship between Regence and the school district. The ASC delegates to Regence the authority to process claims and interpret the plan on the school district's behalf, while the school district retains "the final responsibility and liability for payment of all benefits under the [plan]." Additionally, the ASC provides that the school district "may choose to delegate to Regence the discretionary authority to administer and make appeals decisions for all, some, or none of the member appeal levels."

¶3      Under the plan, with the exception of certain preventative care, "[t]o be covered, medical services and supplies must be Medically Necessary for the treatment of an Illness or Injury." Regence encourages beneficiaries of the plan to seek pre-authorization "to determine Medical Necessity prior to services being rendered." To assist in its determination of whether a requested service is medically necessary, Regence typically requests the beneficiary's medical records.

¶4      In June 2017, the Mayo Clinic sent Regence a pre-authorization request in which it diagnosed M.A. with "[c]hronic constipation secondary to pelvic floor dysfunction" and requested that Regence authorize a "two-week pelvic retraining program" during which M.A. would "learn the

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

techniques and undergo biofeedback therapy[2] to optimize pelvic floor muscle function during defecation."

¶5 Regence applies criteria listed under the Biofeedback Allied Health Policy Number 32 (the Biofeedback Criteria) in determining whether biofeedback treatment is medically necessary. Per the Biofeedback Criteria, "up to six biofeedback sessions over three months" may be medically necessary for adults suffering from "Dyssynergia-type constipation"[3] when three criteria are met:

    1.    Symptoms of functional constipation that meet all (a–c) of the following ROME III criteria:

        a.    Two or more of the following symptoms (i–vi) have been present for the past three months, with symptom onset at least six months prior to diagnosis:

---

2. "Biofeedback is a technique [patients] can use to learn to control some of [their] body's functions, such as . . . heart rate. During biofeedback, [patients are] connected to electrical sensors that help [them] receive information about [their] body." *Biofeedback*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/biofeedback/about/pac-20384664 [https://perma.cc/C5LW-KEG8]. It is "used to help manage" constipation and many other "physical and mental health issues." *Id.*

3. Pelvic floor muscles "must relax in a coordinated manner . . . to successfully eliminate stool from [the] rectum," and pelvic floor dyssynergia is marked by the failure of the muscles to relax, resulting in constipation. *Pelvic Floor Dyssynergia*, Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/digestion-and-metabolic-health/pelvic-floor-dyssynergia.html [https://perma.cc/J4T2-3UYW].

     i.  Straining during at least 25% of defecations
     ii.  Lumpy or hard stools in at least 25% of defecations
     iii.  Sensation of incomplete evacuation for at least 25% of defecations
     iv.  Sensation of anorectal obstruction/blockage for at least 25% of defecations
     v.  Manual maneuvers to facilitate at least 25% of defecations (e.g., digital evacuation, support of the pelvic floor)
     vi.  Fewer than three defecations per week
    b.  Loose stools are rarely present without the use of laxatives
    c.  Insufficient criteria for irritable bowel syndrome
  2.  Objective physiologic evidence of pelvic floor dyssynergia when one or both of the following criteria are met:
    a.  Inappropriate contraction of the pelvic floor muscles
    b.  Less than 20% relaxation of basal restricting sphincter pressure by manometry, imaging, or EMG
  3.  Failed 3-month trial of standard treatments for constipation including laxatives, dietary changes, and pelvic floor exercises

¶6 In response to the Mayo Clinic's pre-authorization request, Regence wrote the Mayo Clinic and asked for medical documentation on whether M.A. suffered from "dyssynergia type constipation" and whether she met the Biofeedback

Criteria, which Regence listed in its letter. The Mayo Clinic forwarded M.A.'s medical records to Regence the following day.

¶7    Regence denied the requested pre-authorization. In a letter dated July 21, 2017, Regence informed M.A. that, based on the determination of a physician who reviewed the request (Physician Reviewer 1), the requested services were not medically necessary because

> [t]he clinical documentation we received from your doctor does not clearly show:
>
> - That you have dyssynergia type of constipation.
>
> - Documentation does not clearly show functional constipation, or how long it has been present.
>
> - Objective evidence was not received, and unclear if you have failed a 3 month trial of standard treatment for constipation.

This letter, and every subsequent letter of denial, listed the Biofeedback Criteria in their entirety. The letter also informed M.A. of Regence's appeals process, including two levels of internal appeals followed by an external review by an independent review organization (IRO). The letter stated that M.A. could include additional information not previously considered with each new appeal.

¶8    The Mayo Clinic appealed the denial on M.A.'s behalf. The appeal included a letter from one of the Mayo Clinic's gastroenterology and hepatology specialists (Specialist). Specialist stated that "[i]t was our impression that [M.A.] has constipation due to pelvic floor dysfunction" and that "[t]his diagnosis was supported by the patient's symptoms, our clinical

findings, and diagnostic tests." Specialist believed that M.A. "would benefit considerably from pelvic floor retraining," which "is universally accepted as the cornerstone for treating patients with obstructed defecation." Specialist also included an academic article that supported biofeedback as a treatment for constipation but did not forward any additional medical records concerning M.A.'s condition or its prior treatment.

¶9 In resolving the appeal, a second physician (Physician Reviewer 2) reviewed M.A.'s medical records to determine whether the requested treatment was medically necessary. Physician Reviewer 2 upheld the denial. Specifically, she determined that (1) the records did not establish that any of the listed symptoms had been present for the past three months; (2) the sub-criterion of "[i]nappropriate contraction of pelvic floor muscles" was met, thus satisfying criterion 2;[4] and (3) the records did not document a "[f]ailed 3-month trial of standard treatments for constipation." In sum, Physician Reviewer 2 concluded that M.A.'s medical records did not establish that her symptoms satisfied the first and third requirements of the Biofeedback Criteria.

¶10 On July 27, 2017, Regence notified M.A. of Physician Reviewer 2's decision, stating,

> The clinical documentation we received from your doctor does not clearly show how long your symptoms have been present and does not establish that your symptoms meet the ROME III criteria listed below. In addition, while the documentation indicates that you have been taking Senna and Linzess, it is unclear that you have

---

4. Physician Reviewer 2 also determined that M.A. had not met sub-criterion 2.b., but criterion 2 requires only that "one or both" of sub-criteria 2.a. and 2.b. is met.

failed a 3-month trial of standard treatments for constipation including laxatives, dietary change, and pelvic floor exercises. Your health plan does not cover services that are not medically necessary.

¶11 In August 2017, M.A. filed her own appeal in which she provided additional medical records from University of Utah Healthcare, Utah Gastroenterology, and Wasatch Endoscopy Center. This time, Regence forwent a second internal review and instead forwarded the appeal to an IRO. A board-certified physician in gastroenterology and internal medicine (Physician Reviewer 3) performed the review.[5] Physician Reviewer 3 concluded that "[b]ased on the submitted documentation, biofeedback training with pelvic floor training . . . would not be medically necessary according to" the Biofeedback Criteria. Specifically, he determined:

Although the patient does have incomplete evacuation and frequent altered bowel habits, the nature and frequency is not estimated in the documentation. Based on the submitted documentation and medical policy for dyssynergia-type constipation all criterion are not met. . . . Biofeedback training is not medically necessary as criterion . . . 1.a. is not met. The documentation does not state that the patient has had straining, lumpy or hard stools, or sensation of incomplete defecation with at least 25% of defecations; sensation of anorectal obstruction; or manual maneuvers to facilitate defecation for at

---

5. In addition to the review, Physician Reviewer 3 attested, among other things, that he did "not accept compensation that is dependent in any way on the outcome of the case" and that he "was not involved with the specific episode of care prior to this review."

least 25% of the time or fewer than 3 defecations per week. The policy criterion . . . 1.b. and c. also require that the patient have loose stools rarely without use of laxatives and does not meet criteria for irritable bowel syndrome. Policy criteria [2.a. and 2.b.] are also not met as there is no documentation of inappropriate contractions of the pelvic floor muscles, or less than measured 20% relaxation of basal resting sphincter pressure. The only criterion met is documentation of failure of three months of standard treatments for constipation.

Based on this independent review, Regence notified M.A. in a letter dated August 30, 2017, that the IRO upheld its decision to deny pre-authorization.

¶12    In February 2018, M.A., through counsel, appealed with Regence a final time. As part of the appeal, M.A. submitted letters from several of her treating physicians, including a second letter from Specialist, dated December 22, 2017. In this letter, Specialist stated that in his opinion, M.A. "has dyssynergia type constipation," "had been afflicted with functional constipation for at least 36 months," and "has failed a 3-month trial of local, standard treatment for constipation." He concluded, "I have reviewed the denial criteria sent to [M.A.] by Regence, and it is my professional opinion that she has met each of the criteria specified there." Regence forwarded this third appeal to a second IRO for review. A physician certified by the American Board of Internal Medicine in General Internal Medicine and Gastroenterology (Physician Reviewer 4) upheld Regence's decision. Although Physician Reviewer 4 concluded that M.A. satisfied the second and third criteria, she determined that M.A.'s records did "not definitively document[]" any of the requisite symptoms listed under the first criterion. Physician Reviewer 4 also concluded that "the provided records do not clearly document that functional constipation has been ruled

out, and therefore the [Biofeedback Criteria] are not met, and the guidelines and literature do not necessarily support the request for biofeedback therapy as medically necessary."

¶13   In November 2018, M.A. sued Regence in district court, alleging breach of contract, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Regence moved for summary judgment, which the court granted following a hearing. The court ruled that the breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress claims "fail as a matter of law" because "Regence's denial of benefits was 'fairly debatable.'" The court stated that "[s]pecifically, Regence relied on the opinions of four physicians to reach its conclusion that the requested treatment was not medically necess[ary] under the . . . Biofeedback Criteria," whereas the letters and medical records M.A. submitted "contained conclusory statements and did not support the requisite elements and factors in the criteria." The court also concluded that the breach of contract claim "fails because [M.A.] and Regence have no contract with each other."

¶14   M.A. appealed the district court's decision to the Utah Supreme Court, which transferred the matter to us for resolution.

ISSUE AND STANDARD OF REVIEW

¶15   M.A. raises one issue that we address on the merits.[6] She argues that the district court erred in granting summary

_____

6. M.A. also argues that the district court erred in granting summary judgment on her breach of contract claim on the ground that "[she] and Regence have no contract with each other." She argues that although she "is not a direct party to the [ASC]," she nonetheless had the right to sue for breach of contract because "she is clearly and expressly an intended
(continued…)

(…continued)

beneficiary of the contract with respect to the claims review and appeals process conducted by Regence." *See Reperex, Inc. v. Coldwell Banker Com.*, 2018 UT 51, ¶ 49, 428 P.3d 1082 ("[T]hird-party beneficiary status [is] an exception to the requirement of privity.") (quotation simplified); *Bybee v. Abdulla*, 2008 UT 35, ¶ 36, 189 P.3d 40 ("A third party may claim a contract benefit only if the parties to the contract clearly express an intention to confer a separate and distinct benefit on the third party.") (quotation simplified).

But M.A. did not raise this argument below and, thus, it is not preserved for appeal. Indeed, during the hearing on Regence's motion for summary judgment, the court itself raised the question of whether M.A. was a third-party beneficiary of the ASC but expressly declined to "consider that theory" because it "was not raised in the briefing." M.A. contends that in opposing summary judgment, she argued "that Regence's oversight and responsibility for the claims administration process created an obligation directly to [her]" and that although she cited unrelated legal authority, she presented a foundation for the third-party-beneficiary argument that was sufficient to allow the court to rule on the issue. *See Torian v. Craig*, 2012 UT 63, ¶ 20, 289 P.3d 479. But an inspection of her memorandum reveals that M.A. argued only that Regence does not lose "any culpability for bad faith decisions simply because [the school district] pays its employees' medical bills directly." This assertion did not sufficiently raise her third-party-beneficiary argument. Accordingly, this issue is not preserved for appeal, and because M.A. does not ask us to review this issue pursuant to any of the exceptions to our preservation requirement, we do not address it further. *See State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 (stating that for an issue to be preserved for appeal, it "must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority") (quotation simplified).

judgment in Regence's favor on her breach of the implied duty of good faith and fair dealing claim on the ground that Regence's denial of coverage was "fairly debatable."[7] "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 6, 286 P.3d 301 (quotation simplified).[8]

## ANALYSIS

¶16    An insurer owes an implied duty of good faith and fair dealing to an insured.[9] *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7,

---

7. M.A. does not appeal the district court's grant of summary judgment in Regence's favor on her intentional infliction of emotional distress claim.

8. The *Jones* court also noted that "because of the complexity and variety of the facts upon which the fairly debatable determination depends," we afford the district court's decision "some deference" when that determination is fact intensive. *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶¶ 6, 13, 286 P.3d 301 (quotation simplified). And it made this statement in the context of reviewing a summary judgment. It is difficult to square this deference with the as-a-matter-of-law determination that typifies appellate review of summary judgments. But we need not wrestle with the question here. Even according the district court's decision no deference, we readily conclude that it correctly ruled, as a matter of law, that M.A.'s entitlement to the requested treatment was fairly debatable.

9. Despite concluding that there was no contractual privity between M.A. and Regence, the district court addressed M.A.'s implied duty of good faith and fair dealing argument, which is based in contract law. Because we affirm the court's grant of summary judgment on the ground that M.A.'s claim was fairly

(continued…)

286 P.3d 301. The duty "contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). In the context of first-party insurance claims,[10] an

---

(…continued)

debatable, we need not decide whether Regence, the third-party administrator of a self-funded group health plan, who is not the insurer in contractual privity with M.A., owes the contractually implied duty of good faith and fair dealing to plan beneficiaries. *See Fire Ins. Exch. v. Oltmanns*, 2018 UT 10, ¶ 61, 416 P.3d 1148 (Durham, J., concurring in part and concurring in the result) ("Although in the third-party context an insurer's breach of its duties as a fiduciary can expose the insurer to punitive damages in tort liability, a breach of the implied duty of good faith and fair dealing in the first-party context only permits remedies in contract law."); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985) ("[I]n a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary. Without more, a breach of those implied or express duties," including the implied duty to act in good faith, "can give rise only to a cause of action in contract, not one in tort."). *See also Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 797 (10th Cir. 1995) (holding, based on Oklahoma law, that the determination of whether a third-party administrator owes a duty of good faith to an insured "should focus . . . on the factual question of whether the administrator acts like an insurer such that there is a 'special relationship' between the administrator and insured that could give rise to a duty of good faith"). Thus, for purposes of this issue, we treat Regence as we would a "true" insurer in contractual privity with the insured.

10. "First-party" refers "to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for

(continued…)

insurer acts reasonably in denying a claim "if the insured's claim is fairly debatable." *Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 28, 56 P.3d 524. This is because if "an insured's claim . . . is fairly debatable, then the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so." *Id.* (quotation simplified). Thus, even though an insured's claim might ultimately be found to be proper, an insurer has not breached the duty of good faith if, at the time of denial, the insured's claim was fairly debatable. *Jones*, 2012 UT 52, ¶ 7.

¶17   Of course, an insurer will not prevail on summary judgment simply by asserting that a claim is fairly debatable. *Id.* ¶¶ 9, 12. "An analysis of whether an insurance claim is fairly debatable is closely related to an analysis of whether an insurer fulfilled its duty . . . to evaluate the claim fairly." *Id.* ¶ 12. Accordingly, "[w]hen making the determination of whether a claim is fairly debatable, a judge should remain mindful of an insurer's implied duties to diligently investigate claims, evaluate claims fairly, and act reasonably and promptly in settling or denying claims." *Id.* A claim is therefore fairly debatable as a matter of law "only when there is a legitimate factual issue as to the validity of the insured's claim, such that reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care." *Id.* (quotation simplified).

---

(…continued)
losses suffered by the insured." *Beck*, 701 P.2d at 798 n.2. "In contrast, a 'third-party' situation is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit." *Id. See also Oltmanns*, 2018 UT 10, ¶¶ 38–39 (Durham, J., concurring in part and concurring in the result) (distinguishing the relationship between the insurer and the insured in the context of first-party and third-party claims).

¶18 Here, M.A. argues that when viewing the facts in a light most favorable to her as the nonmoving party, her request for pre-authorization was not fairly debatable because her medical records contradicted Regence's basis for denying treatment—i.e., that she had not established medical necessity by satisfying the Biofeedback Criteria. She contends that "[g]iven the unequivocal professional opinion of [Specialist] that directly contravened Regence's stated basis for the denial, a jury could conclude that Regence did not act reasonably when it denied coverage." She further asserts that "[t]he fact that Regence utilized the services of a medical professional—or even more than one medical professional—in denying [her] coverage does not establish as a matter of law that Regence's denial was reasonable, but only that Regence has access to doctors who will support its initial conclusions."[11]

¶19 In making these arguments, M.A. relies heavily on Specialist's second letter in which he stated that in his professional opinion, M.A. "has dyssynergia type constipation," "had been afflicted with functional constipation for at least 36

---

11. M.A. also argues that summary judgment was inappropriate because "there are material facts in dispute as to what information Regence used to deny [her] request for coverage." But apart from her heavy reliance on Specialist's second letter and a passing and generalized reference to her medical records, unsupported by citations to the record or any focused discussion of which specific dates and "description of the illness" contained therein would satisfy any of the Biofeedback Criteria, M.A. does not identify which records, if considered by Regence in denying her claim, would render its denial of coverage a breach of the implied covenant of good faith and fair dealing. *See* Utah R. App. P. 24(a)(8). And as hereinafter discussed, Specialist's second letter—which Specialist wrote after the second appeal failed—was insufficient, at the very least, to satisfy the first criterion.

months," and "has failed a 3-month trial of local, standard treatment for constipation." The letter concluded with Specialist's statement that following his review of "the denial criteria sent to [M.A.] by Regence, . . . it is [his] professional opinion that she has met each of the criteria specified there." M.A. contends that "[w]hen a well-respected expert treating physician addresses the reasons for denial of coverage point by point, and informs the insurer that in his professional opinion, treatment is medically necessary as defined by the insurer's own standards, there is an obvious material dispute of fact that makes summary judgment inappropriate."

¶20 The Biofeedback Criteria permitted Regence to approve "up to six biofeedback sessions over three months" for adults suffering from "[d]yssynergia-type constipation" when three criteria are met. Physician Reviewer 1 initially denied coverage because (A) the medical records did "not clearly show" that M.A. suffered from "dyssynergia type of constipation"; (B) the records did "not clearly show functional constipation, or how long it has been present" (referring to criterion 1); (C) "[o]bjective evidence was not received" (referring to criterion 2); and (D) it was "unclear if [M.A.] failed a 3 month trial of standard treatment for constipation" (referring to criterion 3). At the time of denial, Physician Reviewer 1 did not have access to Specialist's second letter when reviewing the Mayo Clinic's pre-authorization request. It was not until the third and final appeal that M.A. provided the letter, dated December 22, 2017, for Physician Reviewer 4 to consider. Thus, the initial denial and subsequent two appeals upholding the denial cannot be deemed unreasonable on the basis that the letter refuted the denials. *See Jones*, 2012 UT 52, ¶ 7 ("An insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied.") (quotation simplified). And M.A. has not directed us to the contents of the remaining medical records she made available to Regence that contradict the physician reviewers'

determinations that M.A. had not satisfied the Biofeedback Criteria.

¶21     In any event, even for purposes of the final IRO appeal, Specialist's second letter did not satisfy the first criterion—the criterion that all four physician reviewers agreed was not even partially met. The first criterion requires that medical records show:

> 1.     Symptoms of functional constipation that meet all (a–c) of the following ROME III criteria:
>     a.     Two or more of the following symptoms (i–vi) have been present for the past three months, with symptom onset at least six months prior to diagnosis:
>         i.     Straining during at least 25% of defecations
>         ii.     Lumpy or hard stools in at least 25% of defecations
>         iii.     Sensation of incomplete evacuation for at least 25% of defecations
>         iv.     Sensation of anorectal obstruction/blockage for at least 25% of defecations
>         v.     Manual maneuvers to facilitate at least 25% of defecations (e.g., digital evacuation, support of the pelvic floor)
>         vi.     Fewer than three defecations per week
>     b.     Loose stools are rarely present without the use of laxatives

          c.       Insufficient criteria for irritable bowel syndrome

¶22    Specialist's second letter did not address any of the requisite symptoms listed under the first criterion. Instead, it included the blanket statement that in Specialist's opinion, M.A. "has dyssynergia type constipation." But the Biofeedback Criteria approved biofeedback treatment for adults suffering from dyssynergia type constipation *if* they satisfied the three criteria. Accordingly, the fact that M.A. suffered from dyssynergia type constipation alone does not satisfy the first criterion. Furthermore, without discussion by Specialist of M.A.'s specific symptoms, it was reasonable for Regence and Physician Reviewer 4 not to rely on Specialist's blanket statement that based on his review of "the denial criteria sent to [M.A.] by Regence," which included the Biofeedback Criteria in their entirety, "it is [his] professional opinion that she has met each of the criteria specified there."

¶23    We therefore agree with the district court that the medical records and letters M.A. has brought to our attention "did not support the requisite elements and factors in the [Biofeedback Criteria]." Because M.A. has not shown how the medical records she submitted to Regence contradicted Regence's claim that her symptoms did not meet, at the very least, the first criterion of the Biofeedback Criteria, a "legitimate factual issue as to the validity of [M.A.'s] claim" existed. *See Jones*, 2012 UT 52, ¶ 12 (quotation simplified). Accordingly, M.A.'s entitlement to coverage for the treatment that was the subject of her pre-authorization request was fairly debatable, and Regence's denial was therefore reasonable.

## CONCLUSION

¶24    Because M.A. has not directed the district court's attention or ours to medical records indicating that she experienced any of the symptoms listed in the first criterion of

the Biofeedback Criteria, it was fairly debatable whether the requested biofeedback treatment was medically necessary. Regence therefore did not breach the implied duty of good faith and fair dealing, as a matter of law, when it denied coverage.

¶25    Affirmed.

————————