2021 UT App 64

# THE UTAH COURT OF APPEALS

KURT LUND AND TERENA LUND,
Appellees,
*v.*
TRUCK INSURANCE EXCHANGE,
Appellant.

Opinion
No. 20191043-CA
Filed June 24, 2021

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 180100009

Paul M. Belnap, Stuart H. Schultz, and Chet W.
Neilson, Attorneys for Appellant

Bretton K. Hadfield and Matthew D. Lorz, Attorneys
for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Truck Insurance Exchange (TIE) declined to pay Terena
and Kurt Lund's underinsured motorist (UIM) coverage claim
after it determined that Terena may have been at least fifty
percent at fault for a two-vehicle accident in which she was
involved.[1] After the claim was denied, the Lunds filed a
complaint alleging, among other causes of action, that TIE's
denial of the claim breached the policy's implied covenant of

---

1. Because the Appellees share the same last name, we refer to
them by their first names for clarity and ease of reference.

good faith and fair dealing. TIE filed a motion for partial summary judgment, arguing that its decision to deny the Lunds' UIM claim could not, as a matter of law, have been made in bad faith because the validity of the claim was fairly debatable. The district court denied the motion, and TIE sought interlocutory appeal. We reverse the denial of TIE's motion and remand for this matter for further proceedings.

## BACKGROUND

¶2 TIE issued an automobile insurance policy to Kurt that provided UIM coverage for "all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'underinsured motor vehicle.'"[2] Kurt was the named insured on the policy, but the policy clarified that family members of the named insured were also "insureds" under the policy.

### *The Accident*

¶3 On February 13, 2013, shortly before 10:00 a.m., Terena, driving a red Hyundai, collided with the driver (Driver) of a

---

2. "Underinsured motorist coverage provides first-party insurance protection for damages that exceed the limits of the tort-feasor's bodily injury coverage. Underinsured motorist coverage is a facet of uninsured motorist coverage; its purpose is to provide insurance protection to the insured against damages caused by a negligent motorist as if the motorist had another liability policy in the amount of the underinsured policy." *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993); *see also* Utah Code Ann. § 31A-22-305.3(1)(b)(i) (LexisNexis Supp. 2020).

white Buick.[3] No passengers accompanied Terena, while Driver was traveling with four passengers. The accident left Terena with significant and permanent injuries, including brain trauma, bone fractures, facial lacerations, and various contusions.

¶4    The police report of the accident stated that the driver of the white Buick "changed lanes in an attempt to pass the red Hyundai and began to accelerate. At approximately the same time, the driver of the red Hyundai changed lanes in an attempt to pass an unknown vehicle traveling in front of her." The report went on to state,

> The white Buick swerved to the left, went off the roadway and onto the shoulder before over correcting to the right and colliding with the red Hyundai. The white Buick's right front tire impacted the red Hyundai's left rear tire. This impact acted essentially as a pit maneuver and spun the red Hyundai around 180 degrees. The red Hyundai continued sliding until it struck a concrete bridge support on the right front of the car. The red Hyundai's momentum caused it to overturn and land on its roof on the top of the bridge. . . . The driver of the white Buick was able to guide his car . . . off of the roadway, down an embankment, and [to a stop].

The report concluded by stating that "neither driver was issued a citation for unsafe passing" because "law enforcement has

---

3. The various reports in the record use multiple terms for the individuals and vehicles involved in this accident. For ease of reference throughout this opinion, we use "red Hyundai," "white Buick," "Terena," and "Driver" without using brackets to indicate alterations to quotations.

been unable to definitively prove which vehicle entered the passing lane first."

¶5 The police report also included written statements from three independent eyewitnesses. Eyewitness 1 wrote that he was driving east when he saw the red Hyundai pull out to pass and clip the white Buick, which was already in the process of passing. He reported that the collision sent the white Buick skidding into a ditch, where it stopped, while the red Hyundai hit a bridge abutment, flipped, and landed upside down.

¶6 Eyewitness 2 stated, "I saw a white Buick pull across the yellow line to pass. As the white Buick was passing[,] the red Hyundai in front of it pulled out to pass as well[,] and the red Hyundai's front end clipped the back end of the white Buick." She saw the white Buick go off the road and the red Hyundai land "on its roof after hitting the cement barrier on the bridge."

¶7 Eyewitness 3 wrote that there was an SUV, the red Hyundai, and the white Buick, traveling in that order. She stated that the white Buick pulled out to pass the red Hyundai and the SUV. She explained, "[T]hen the red Hyundai pulled out a little then went back[;] as the white Buick was still passing[,] the red Hyundai pulled out to pass and hit the white Buick. The white Buick stopped off the road [and] the red Hyundai flipped and hit the cement barrier and landed on [its] hood."

*TIE's Investigation*

¶8 Within days, the Lunds informed TIE of the accident. In its investigation, TIE's claims representative (Representative) spoke with Driver a few days after the accident. Driver said that he "[w]as going in the same direction [as] Terena was and he was trying to pass her." He said he "used [his] blinkers," "pulled out into [the] on coming [lane]," and "his car got even with Terena's driver side back door." Driver asserted that at this moment, Terena "tried to pass the person in front of her." Driver

said he "tried to go to the side of the road," but "his vehicle hit the snow on the side of the road and he lost control . . . . Terena was still coming over to Driver's lane [and] collided." About ten days after the accident, Representative spoke with the Lunds' insurance agent, who told Representative that Terena "was trying to pass . . . [the] car in front of her" and that she "looked in [the] mirror [and] saw Driver but he was behind her." The agent said that as Terena "began to change lanes . . . Driver was there, then his vehicle came towards her and [the] collision occurred." Representative explained to the agent "that it sounds like Terena might be at fault for [the] accident" but noted that she "did not want to make a decision like that without speaking with [the insured]."

¶9      A few weeks later, Representative, who had not yet received the police report, indicated in a claim summary that the accident involved a passing dispute and that liability was yet undetermined. But Representative summarized TIE's understanding of the accident as follows:

> Based on Driver's statement and Terena's [account] through agent, Driver moved into [the] oncoming lane to pass Terena and another slow moving vehicle. Terena then began to move into [the] same oncoming lane so Driver continued to veer left in an attempt to avoid [her]. Driver struck snow on the side of the road causing him to lose control and strike Terena's vehicle which caused it to lose control and hit a barrier.

Shortly thereafter, Representative received the police report, which included the eyewitness statements. And in late April, Representative wrote in the claim summary report, under the heading "Liability Overview," that "[n]o statement" had been "received from insured driver." The report went on to summarize Representative's investigation:

> Driver states that [as] he was trying to pass Terena his car got even with the red Hyundai and Terena attempted to pass [the] vehicle in front of her, [and] Driver tried to get on [the] side of the road as much as he could[. T]hey collided, then they both spun around [and Terena's car] began to roll.
>
> [Eyewitness 1] states that Terena [had] attempted to get over as Driver was passing, [and] Terena crossed the lines but went back into her lane, then Driver saw that Terena had gone back in [and] he accelerated and he attempted to pass her again, [but] she then began to come over into [his] lane, [and he] tried to get over to [the] side of the road as much as possible[. T]hey came into contact with each other, [and] Terena overcorrected and caused her vehicle to roll.

¶10   The claim report noted that the police report "makes a narrative but does not [choose] sides" and concluded, "It appears our insured was 100% negligent for this loss based on over correcting vehicle [once] collision occurred between the two lanes." An additional comment states, "Appears insured is 100% negligent for this loss please close your claim." In a letter, dated April 30, Representative informed the Lunds' attorney, "I have completed my investigation into this loss and it appears at this time Terena would not have a claim to present against this policy."

¶11   GEICO, Driver's liability insurer, submitted materials concerning the accident to an accident reconstructionist. The detailed report, which was completed in August 2014, came to the conclusion that "the white Buick was established in the . . . lane" when the red Hyundai "encroached into the path of the white Buick, and physical contact between the two vehicles resulted." The GEICO reconstructionist concluded,

> Terena had sufficient available visual information
> to have known not to move into the passing lane at
> that time, had she been paying appropriate
> attention to her operating environment. . . . The
> initial contact, and all subsequent collision events
> including the red Hyundai's wall impact and
> overturning, occurred as a result of Terena's choice
> to move from her lane into the adjacent lane
> directly into the established path of the white
> Buick.

Even though it concluded that Terena's driving had likely
caused the collision, GEICO voluntarily paid the policy limits of
$100,000 to the Lunds in January 2015, a necessary prerequisite
for Terena's request for UIM benefits from TIE.

¶12 In its summary report from September 2014—a point at
which it had become apparent that litigation was likely—TIE
described its understanding of liability for the accident in the
following terms: "Appears Terena has the majority of fault, as
witnesses state Driver pulled into the opposite lane before she
did. There may also be an argument for comparative fault on
Driver. [Representative] accepted liability and we paid [GEICO's
subrogation] demand at 100%." And in a summary report dated
a few days later, TIE noted that while liability was pending as
neither driver was cited, "witness statements seem[ed] to be
adverse to Terena" because they "indicate[d] that the white
Buick pulled out to pass and was passing [the] red Hyundai
when Terena then pulled out to pass the vehicle in front—this
would indicate that Terena may have attempted to pass when
unsafe to do so—liability may be a challenge on this case for
Terena."

¶13 In May 2015—over two years after the accident—TIE's
counsel (Counsel) sent the materials concerning the accident
(namely, the police report, witness statements, estimates,
and photographs) to a different accident reconstructionist

(Reconstructionist). Counsel wrote to Reconstructionist, "After you have an opportunity to review the photos and the . . . materials, please give me a call so we can discuss your initial thoughts concerning the responsibility for this accident and what activities you would need to conduct to finalize your opinions."

¶14　Around the same time, Counsel wrote an update to TIE on the status of his investigation of the crash. Counsel noted that the Utah Highway Patrol trooper who investigated the crash "indicated that it was very difficult for him to determine who was responsible for the accident. He could not conclusively determine if Driver's vehicle was in the passing lane before Terena's vehicle entered the passing lane. He also indicated that it was a confusing accident scene." However, Counsel noted that the trooper "admitted that all 3 independent witnesses in their statement[s] indicated that [the] red Hyundai struck the white Buick as Terena tried to pass the vehicle in front of her." Counsel also noted that he contacted GEICO requesting the claim file and the accident reconstruction it had performed, but GEICO would not share the information absent a subpoena.

¶15　In February 2016—three years after the accident—Counsel advised TIE that he had interviewed two of the eyewitnesses. Eyewitness 1 stated that Driver was already in the passing lane when Terena started to pull out in an attempt to pass. Eyewitness 2 stated that the front bumper of Terena's vehicle made contact with Driver's car. This eyewitness also "indicated that Terena should have seen the white Buick without difficulty." Counsel reported that he had attempted to discuss the accident with the passengers in Driver's car but had not received "any cooperation from them to this point."

¶16　In April 2016, Counsel reported to TIE that Reconstructionist had "reviewed the documents," plotted "the crash movement," and "performed calculations to establish the sequence and cause of the accident." Counsel told TIE that Reconstructionist's "conclusions [were] very favorable and it

[was] clear to [Reconstructionist] that Terena was the cause of the accident":

> Based on the markings [Reconstructionist] was able to observe provided by the Utah Highway Patrol, it is clear to him that Driver's vehicle was in the passing lane when Terena attempted to move into the passing lane to make a pass of the car in front of her. The physical evidence demonstrates that Driver was required to make an evasive maneuver in response to Terena entering his lane of travel. This evasive maneuver was to the left and forced Driver's vehicle[] off the roadway on to the berm. As a result of this exiting of the roadway Driver lost control of his vehicle and struck Terena's vehicle in the left rear . . . . The physical evidence demonstrates this impact occurred in the passing lane. . . . The physical evidence also corroborates the version of the accident related by Driver.

*The Lunds' UIM Claim*

¶17 About a year later, in May 2017, the Lunds' attorney sent a letter to TIE with a formal demand for UIM benefits to pay medical expenses for injuries Terena sustained in the accident: "In our evaluation of her case, we believe there is no question that Terena's situation represents a policy limits claim and therefore demand the sum of $1,000,000." In June, Counsel responded in writing that TIE was "declining to make [a UIM] offer" at that time:

> The applicable underinsured vehicle is the one operated by Driver. Based on our investigation, we believe Terena was the sole proximate cause of the accident and consequently her injuries. At a minimum she is at least 50% responsible for the accident and consequently her injuries. With that

factual scenario, Terena is not legally entitled to recover compensatory damages from Driver, and therefore does not possess a valid UIM claim against [TIE].

¶18   The Lunds filed a complaint against TIE in January 2018, alleging breach of contract, breach of the covenant of good faith and fair dealing, and loss of consortium. Regarding the breach of the covenant of good faith and fair dealing, which claim is the focus of this appeal, the Lunds asserted that TIE (1) placed "its own economic interests over those of Terena"; (2) made "an unrealistically low settlement offer that was substantially below the reasonable value of the claim, given Terena's injuries and loss"; (3) failed "to properly and diligently investigate and fairly evaluate Terena's claim"; (4) refused "to promptly and reasonabl[y] tender its uninsured [p]olicy limits, or the reasonable value of Terena's claim"; (5) refused "to provide any clear justifiable basis for its unreasonably low offer or refusal to tender [p]olicy limits"; and (6) "forc[ed] Terena to file suit to force [TIE] to honor its obligations, and to incur substantial costs and fees as a result."

¶19   During the mediation process, TIE deposed Terena and Eyewitness 1. And Counsel provided a copy of Reconstructionist's report, which had concluded that Terena "was the primary and sole cause" of the accident. After mediation proved unsuccessful, the Lunds filed an amended complaint, again identifying the same three causes of action contained in the initial complaint.

¶20   After deposing Eyewitness 2, TIE filed a motion for partial summary judgment. TIE argued that while the duty of good faith and fair dealing contemplates that an insurer will diligently investigate the facts to determine whether an insured's claim is valid, "[i]f a claim brought by an insured against an insurer is fairly debatable, failure to comply with the insured's demands cannot form the basis of bad faith." (Quoting *Saleh v.*

*Farmers Ins. Exch.*, 2006 UT 20, ¶ 24, 133 P.3d 428.) Moreover, TIE argued that "an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied." (Quoting *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7, 286 P.3d 301.) And TIE pointed out that "a claim is fairly debatable where there is evidence that creates a factual issue as to the claim's validity." (Quotation simplified.) Accordingly, TIE urged the court to grant partial summary judgment because the Lunds' "cause of action for breach of the implied covenant of good faith and fair dealing fail[ed] as a matter of law."

¶21    In a very brief order, the district court denied the motion, stating that under the test articulated in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985), "minds could reasonably differ as to whether or not [TIE] fairly evaluated [the Lunds'] insurance claim and that issues raised by [the Lunds' breach of the covenant of good faith and fair dealing] cause of action were appropriate for a jury." *See id.* at 801. ("[T]he implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim.").

¶22    TIE filed a petition seeking permission to file an interlocutory appeal of the district court's order denying its motion for partial summary judgment, which we granted.[4]

---

4. The Lunds assert that the court's denial of TIE's motion for summary judgment is not appropriate for an appeal. While it is true that interlocutory orders are not appealable as of right, the Utah Rules of Appellate Procedure allow for discretionary appeals from interlocutory orders. *See* Utah R. App. P. 5(a)

(continued…)

ISSUE AND STANDARD OF REVIEW

¶23    TIE asserts that the district court erred in applying the law on the "fairly debatable" defense when it denied TIE's motion for partial summary judgment. "We review a district court's grant or denial of summary judgment for correctness and view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Vander Veur v. Groove Ent. Techs.*, 2019 UT 64, ¶ 7, 452 P.3d 1173 (quotation simplified).

ANALYSIS

¶24    As a threshold matter, we make two observations. First, this case involves a UIM claim. *See generally supra* note 2. The Lunds' insurance policy provided that TIE would "pay all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'underinsured motor vehicle.' The damages must result from 'bodily injury' sustained by the 'insured' caused by the 'accident.'" Here, Terena was TIE's "insured" and the vehicle driven by Driver was the allegedly "underinsured motor vehicle." The Lunds argue that

───────────

(…continued)
("Any party may seek an appeal from an interlocutory order by filing a petition for permission to appeal from the interlocutory order with the appellate court with jurisdiction over the case."); *id.* R. 5(g) ("An appeal from an interlocutory order may be granted only if it appears that the order involves substantial rights and may materially affect the final decision or that a determination of the correctness of the order before final judgment will better serve the administration and interests of justice."). Here, we previously exercised our discretion and granted TIE permission to appeal. We decline any invitation to revisit that ruling.

TIE was contractually required to pay up to the policy's limits on their UIM claim because they allege Driver was at fault for the accident and damages for Terena's injuries exceeded the limits covered by Driver's insurance. But to sustain a valid UIM claim under the conditions of their insurance policy with TIE, the Lunds had to be "legally entitled" to recover damages from the underinsured vehicle. And pursuant to Utah law, they are "legally entitled" to recover only if Driver's fault for the accident exceeded Terena's. *See* Utah Code Ann. § 78B-5-818(2) (LexisNexis 2018) ("A person seeking recovery may recover from any defendant or group of defendants whose fault . . . exceeds the fault of the person seeking recovery prior to any reallocation of fault . . . .").

¶25   Second, the UIM claim here involved a first-party-insurance relationship between Terena and TIE. The term "first-party" refers "to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 n.2 (Utah 1985).[5] Under the "first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual." *Id.* at 800. And "as parties to a contract, the insured and the insurer have parallel obligations to perform the contract in good faith." *Id.* at 801. Moreover, in the UIM-coverage context, the adversarial relationship changes from a third-party dispute between the insured and an alleged tortfeasor to a first-party dispute between the insured and the insurer. *See Estate of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of the Midwest*, 2003 UT App 78, ¶ 8, 67 P.3d 1012, *aff'd*, 2004 UT 104, 106 P.3d 700. Accordingly, once the Lunds made a claim for

---

5. "In contrast, a 'third-party' situation is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 n.2 (Utah 1985).

UIM coverage, Terena and TIE became, "practically speaking, adversaries." *See Beck*, 701 P.2d at 799 (quotation simplified).

¶26 The "implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* at 801. However, "[i]f a claim brought by an insured against an insurer is fairly debatable, failure to comply with the insured's demands cannot form the basis of bad faith." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 24, 133 P.3d 428; *see also M.A. v. Regence BlueCross BlueShield of Utah*, 2020 UT App 177, ¶ 16, 479 P.3d 1152 ("In the context of first-party insurance claims, an insurer acts reasonably in denying a claim if the insured's claim is fairly debatable." (quotation simplified)). "Therefore, an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied." *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7, 286 P.3d 301 (quotation simplified). As relevant here, the district court's decision to grant or deny TIE's partial motion for summary judgment should have turned on whether the Lunds' claim for UIM coverage was "fairly debatable." *Saleh*, 2006 UT 20, ¶ 24. In more concrete terms, the focus of the fairly debatable question was whether Terena's fault for the accident may have exceeded that of Driver. *See Eldredge v. State Farm Mutual Auto. Ins. Co.*, No. 2:12CV900 DAK, 2014 WL 1875663, at *6 (D. Utah May 9, 2014) ("Stated another way, the denial of an insurance claim is reasonable, as a matter of law, if the insured's claim is fairly debatable." (quotation simplified)).

¶27 An insured's claim is "fairly debatable" as a matter of law when the evidence creates "a legitimate factual issue as to the validity" of an insured's claim for benefits. *See Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 35, 56 P.3d 524; *see also M.A.*, 2020 UT App 177, ¶ 17. "Of course, an insurer will not prevail on

summary judgment simply by asserting that a claim is fairly debatable." *M.A.*, 2020 UT App 177, ¶ 17. Rather, an insurer has a "duty under *Beck* to evaluate the claim fairly." *Jones*, 2012 UT 52, ¶ 12 (quotation simplified). And if the insurer has fairly evaluated the claim and there remains "a legitimate factual issue as to the validity of the insured's claim, such that reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care, . . . [then] the court [should] grant judgment as a matter of law." *See id.* (quotation simplified).

¶28 From a procedural point of view, there is no question that TIE "diligently investigate[d] the facts" surrounding the Lunds' claim. *See Beck*, 701 P.2d at 801. TIE gathered a copious amount of evidence over an extended period of time in the course of its investigation. It considered Driver's account of events, the views of the Lunds' own insurance agent, the police report, the statements of all the neutral third-party witnesses, and the report of Reconstructionist. *See Colony Ins. Co. v. Human Ensemble, LLC*, 2013 UT App 68, ¶ 11, 299 P.3d 1149 ("In carrying out [the duty to diligently investigate the facts], the focus is on whether the insurer's investigation was fair and reasonable given the extent and availability of evidence, whether available evidence is collected and witnesses are contacted, common practice in the industry, and clarity of the evidence with regard to issues of liability." (quotation simplified)); *accord Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 21, 100 P.3d 1163.

¶29 Here, the central substantive question is whether, at the time TIE denied the claim, it had facts in front of it that indicated that the validity of the Lunds' claim was fairly debatable. Specifically, in the context of UIM coverage, the underlying question was whether Driver's fault for the accident exceeded Terena's. If TIE's investigation uncovered facts sufficient to show a genuine factual dispute about whether Terena was at least as much at fault as Driver, then the validity of the Lunds' UIM claim under the conditions of the insurance policy was fairly

debatable, and TIE's "failure to comply with [the Lunds'] demands [could not] form the basis of bad faith." *See Saleh*, 2006 UT 20, ¶ 24. As we explain, TIE's conclusion—that the validity of the Lunds' claim was indeed fairly debatable—was supported by abundant evidence.[6]

¶30 The investigation TIE conducted immediately after the accident provided ample information to support a reasonable initial conclusion that Terena may have been more at fault for the accident than Driver. First, after being informed of the accident, TIE formed its early understanding of the accident by interviewing Driver, who told Representative that he and Terena were traveling the same direction and, as he was passing her vehicle and another vehicle, Terena attempted to pass just as his car was even with hers, causing him to lose control.

¶31 Second, Representative spoke with the Lunds' insurance agent, who explained that the collision occurred when Terena

---

6. The Lunds argue that TIE failed to properly marshal the evidence used to support the district court's ruling. Because findings of fact are unnecessary in a summary judgment decision—indeed, there are no findings of fact in the court's order here—it follows that an interlocutory appeal from the grant or denial of a motion for summary judgment does not require marshaling of evidence. *See Smith v. Four Corners Mental Health Center, Inc.*, 2003 UT 23, ¶ 16 n.6, 70 P.3d 904 ("When appealing a district court's grant of summary judgment, . . . the appellant has no obligation to marshal the evidence. The marshaling obligation only arises after a party challenges the sufficiency of the evidence to support a . . . district court's ruling containing specific findings of fact. At the summary judgment stage, the district court is not concerned about the sufficiency of any evidence because it does not resolve any factual disputes. Therefore, [a] . . . marshaling argument [is] inappropriate [in this context]." (quotation simplified)).

was changing lanes to pass and Terena encountered Driver's vehicle. Based on this information, TIE concluded that the accident involved a passing dispute but that it appeared Terena had moved into the "same oncoming lane" that Driver was using to pass a slower moving vehicle.

¶32   Third, TIE's conclusion that Terena may have been at fault was supported by the police report, which contained the statements from the three independent eyewitnesses to the accident. And while Representative noted that "[l]aw enforcement [was] unable to establish who was in the passing lane first," the eyewitnesses unanimously agreed that Driver was in the process of passing when Terena pulled out into the same lane and the collision occurred. Based on this information, TIE's initial determination that Terena may have been at least fifty percent responsible for the loss was reasonable.

¶33   Fourth, Reconstructionist's report also supported TIE's conclusion that Terena may bear at least half of the fault for the accident. We note that an expert's opinion, such as that offered by Reconstructionist, might make an "insured's claim at least fairly debatable." *See Prince*, 2002 UT 68, ¶ 35 (stating that even if a denial is based on an "expert's opinion [that] is provided in exchange for remuneration, [it] is not a bad faith denial [of a claim] because the expert's report creates a legitimate factual question regarding the validity of an insured's claim for benefits"); *see also Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct. App. 1987) (noting that an expert's opinion, when combined with other evidence, supported the conclusion that a claim was fairly debatable). Reconstructionist came to the unequivocal conclusion that Driver's vehicle was in the passing lane first when Terena attempted to pass and that it was "clear to him" that Terena caused the accident.

¶34   In light of the evidence available to TIE during its investigation, there existed a legitimate dispute about whether Terena's fault at least equaled Driver's. Under these

circumstances, the validity of the Lunds' claim was fairly debatable. This is the very point the district court missed in denying TIE's partial summary judgment motion. The court should have come to the opposite conclusion in this context: TIE's investigation into and evaluation of Terena's liability for the accident revealed a legitimate dispute that made the Lunds' UIM claim fairly debatable. And "an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied." *Jones*, 2012 UT 52, ¶ 7 (quotation simplified). Thus, we conclude that the district court erred in denying TIE's motion for partial summary judgment with regard to the Lunds' cause of action for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

¶35　Because the validity of the Lunds' claim was fairly debatable, we conclude that the district court erred in denying TIE's motion for partial summary judgment. Under the circumstances presented here, that motion should have been granted. We reverse the court's order and remand this matter for further proceedings consistent with this opinion.

———————