2026 UT App 94

# THE UTAH COURT OF APPEALS

ERICA NEWMAN,
Appellant,
*v.*
LM GENERAL INSURANCE COMPANY,
Appellee.

Opinion
No. 20241295-CA
Filed June 19, 2026

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 230901729

Caleb Bertch and Daniel F. Bertch,
Attorneys for Appellant

Byron G. Martin and Steven M. Edmonds,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1     Erica Newman sued LM General Insurance Company
(LM), arguing that it handled her underinsured motorist
insurance claim in bad faith. The trial court determined that
Newman had not established damages and granted summary
judgment in LM's favor. Newman appeals. We affirm the court's
ruling on the alternative basis that Newman's bad faith claim was
fairly debatable as a matter of law.

BACKGROUND[1]

¶2    In June 2019, Newman was driving with her husband and two children when they were struck by another car. Newman sustained various injuries, most notably one to her right knee, and she sought and received medical treatment. In the days after the crash, Newman retained counsel on a contingency basis to recover for the injuries.[2] The other driver was at fault for the crash and had liability insurance with a limit of $25,000, and Newman settled with the other driver's insurer for that amount. She also received $10,000 in personal injury protection (PIP) benefits pursuant to her own policy from LM.

¶3    Newman's policy also had an underinsured motorist (UIM) provision, with a limit of $100,000, which obligated LM to "pay compensatory damages which an 'insured' is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle' because of 'bodily injury.'" Believing that her damages exceeded the $35,000 she had already recovered, Newman filed a UIM claim with LM on May 20, 2020. Newman asserted that she had incurred medical expenses of $16,766.74 and noneconomic damages exceeding the policy limit. She demanded the policy limit and gave LM fourteen days to respond.

¶4    An LM adjuster (Adjuster) responded on June 2, stating that he had "fully reviewed all bills/records associated with [Newman's] case" and had "fully evaluated her injury claim." But he could not make an offer at that time, primarily because Newman's claim had not included the amount of the settlement

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *M.A. v. Regence BlueCross BlueShield of Utah*, 2020 UT App 177, n.1, 479 P.3d 1152 (cleaned up).

2. At all relevant times in this case, Newman was acting through her lawyers and her lawyers' support staff.

with the other driver's insurance company but also because the claim was missing a record from one of Newman's doctor visits. Adjuster asked Newman to provide that information to move the claim along. That same day, Newman responded that she had settled with the other company for the policy limit of $25,000 but stated that she could not locate the missing record. Two hours later, Adjuster responded, speculating that Newman's persistent knee pain may have been due to her "morbid obesity." He offered to settle the case for $1,500 in addition to all other sums Newman previously collected. Adjuster stated his belief that the matter was not "a policy limits case," but he also indicated his willingness to "discuss the case further to see if [the parties could] achieve an amicable resolution."

¶5 The next contact between the parties didn't occur until June 10, when Newman emailed Adjuster about the missing medical record. On June 23, Adjuster replied and stated, among other things, that LM would argue that Newman's healing could have been affected by her obesity. Adjuster nonetheless stated a desire to "resolve the claim" and asked if Newman had a counteroffer to LM's initial offer. The next day, Newman responded that there was "a lot more to her damages than [Adjuster was] seeing" and that arbitration would likely be needed to "fully flesh this out." Newman formally rejected LM's offer in July and demanded arbitration. She also requested that LM "tender the undisputed $1,500," and LM did so promptly. After Newman demanded arbitration, LM retained an orthopedic surgeon to conduct a medical evaluation of Newman. In a March 2021 report, the surgeon opined that Newman's continued knee pain was not related to the car crash.

¶6 The matter proceeded to arbitration in August 2021. The arbitrator determined that Newman had incurred $20,255.44 in past medical expenses[3] and suffered $41,000 in general

---

3. The briefs in this matter are not clear on how the arbitrator arrived at this figure of past medical expenses where the original

(continued…)

damages—or $61,255.44 in total damages. The arbitrator also found that Newman had not made "a claim for any other category of special damages," i.e., future medical expenses. Taking into account the $36,500 that Newman had already received ($25,000 from the other driver's insurance company and $11,500 from LM), the arbitrator effectively determined that LM owed Newman an additional $24,755.44. Two weeks after arbitration, LM paid Newman that amount.

¶7 After arbitration, Newman retained new counsel, again on a contingency agreement, and sued LM, asserting a claim for "insurance bad faith" and seeking both special and general damages. In her initial disclosures, Newman stated that her damages included the fees that she had paid to her original counsel, as well as her attorney fees from the instant suit. She also asserted that her general damages were "not calculable and [were] inherently the province of the finder of fact."

¶8 At her ensuing deposition, Newman testified that she sued LM because she felt "insulted" by LM's settlement offer. When LM's counsel asked her what she meant by this statement, Newman responded, "It felt like [LM] just didn't want anything to do with it, and so $1,500 to have you go away and this be over with, when I was at home dealing with everything that I was dealing with was insulting. It was kind of disheartening." She also claimed she felt "emotionally and mentally" "drain[ed]" by the experience. Newman testified that at no point prior to arbitration did she consider settling for less than the $100,000 policy limit. She nonetheless acknowledged she did not "seek any mental health or emotional therapy" or otherwise "go on any medication" due to LM's conduct. She also testified that her credit score had not been negatively affected by the accident. Finally,

---

claim stated the medical expenses were $16,766.74. We assume the arbitrator awarded medical expenses that had been incurred after the claim was submitted but prior to arbitration.

Newman conceded that the arbitrator's award of $61,255.44 was "fair."

¶9     After discovery closed, LM moved for summary judgment, asserting, among other arguments, that (1) its valuation of Newman's underlying claim was "fairly debatable," which would have barred her bad faith claim as a matter of law, and (2) Newman had "no recoverable damages." In support of its motion, LM submitted a declaration from Adjuster, who confirmed—under penalty of perjury—that he had reviewed each of the documents that Newman had submitted with her claim. In her opposition to the motion, Newman argued that summary judgment was inappropriate because (1) the fairly debatable defense didn't apply as LM's handling of her claim was "objectively unreasonable" and (2) it was for the jury to decide whether LM "offered to pay 'the full amount [she was] legally entitled to recover'" on her claim. As to Adjuster's declaration, Newman did not specifically dispute that he had reviewed the documents that she submitted with the claim. She instead objected to Adjuster's declaration on the basis that Adjuster had "full access" to LM's "entire UIM claim file" and disclosed only "select portions" of that file to her.

¶10    The district court overruled the objection and agreed with LM that Newman had no recoverable damages, concluding that she had not established that "she was actually damaged" by LM's conduct.[4] Consequently, the court granted summary judgment in LM's favor and dismissed the complaint.

ISSUES AND STANDARD OF REVIEW

¶11    On appeal, Newman argues that the district court erred in granting summary judgment because (1) the attorney fees she

---

4. The district court determined that LM's offer was "essentially a nuisance offer and a de facto denial of the claim" and therefore disagreed with LM on the fairly debatable argument.

incurred in connection with both the UIM claim and the instant lawsuit were recoverable as consequential damages and (2) a jury should have been allowed to determine whether she suffered emotional distress damages based on LM's conduct. We need not address either of Newman's arguments, however, because we can affirm the court's grant of summary judgment on the alternative ground that Newman's claim was fairly debatable. *See Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996) ("[W]hen an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so."); *Bailey v. Bayles*, 2002 UT 58, ¶ 20, 52 P.3d 1158 ("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record."). "We review a district court's grant or denial of summary judgment for correctness and view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Lund v. Truck Ins. Exch.*, 2021 UT App 64, ¶ 23, 494 P.3d 1045 (cleaned up); *accord Fire Ins. Exch. v. Oltmanns*, 2018 UT 10, ¶ 7, 416 P.3d 1148; *Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 14, 56 P.3d 524. Also on summary judgment, "we review for correctness" a district court's conclusion that a "claim was fairly debatable under the facts of [a given] case." *See Prince*, 2002 UT 68, ¶¶ 14, 33. And where a "legitimate dispute" exists about whether a claim is fairly debatable, the court should resolve the issue in favor of the defendant as a matter of law. *See Lund*, 2021 UT App 64, ¶ 34.

## ANALYSIS

### I. The Fairly Debatable Defense

¶12 "An implied covenant of good faith and fair dealing inheres in every contract." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193. In *Beck v. Farmers Insurance Exchange*, our supreme court held that the implied covenant imposes a duty on an insurer in the first-party insurance context to—at a minimum—(1) "diligently investigate the facts" underlying an

insured party's claim to determine whether it is "valid," (2) "fairly evaluate the claim," and (3) "act promptly and reasonably in rejecting or settling the claim." 701 P.2d 795, 801 (Utah 1985).[5] "When an insurer breaches the implied covenant of good faith and fair dealing and the insured is thereby damaged, the insured may have a bad faith claim against the insurer." *Huitron v. Kaye*, 2022 UT 36, ¶ 38, 517 P.3d 399; *see also id.* ("Bad faith is merely the inverse of the implied covenant of good faith and fair dealing that inheres in all insurance contracts." (cleaned up)). However, damages are not "available for the mere disappointment, frustration, or anxiety normally experienced in the process of filing an insurance claim and negotiating a settlement with an insurer." *Beck*, 701 P.2d at 802 n.6. Moreover, both "the insured and the insurer have parallel obligations to perform the contract in good faith, obligations that inhere in every contractual relationship." *Id.* at 801.

¶13    After *Beck* was decided, this court recognized a "fairly debatable" defense that insurers could assert against bad faith claims. In *Callioux v. Progressive Insurance Co.*, we held that "when a claim is fairly debatable, the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." 745 P.2d 838, 842 (Utah Ct. App. 1987) (cleaned up). And "[i]f the evidence presented creates a factual issue as to the claim's validity, there exists a debatable reason for denial, thereby legitimizing the denial of the claim, and eliminating the bad faith claim." *Id.* The supreme court confirmed the defense was available under Utah law in *Billings v. Union Bankers Insurance Co.*, 918 P.2d 461 (Utah

---

5. A first-party insurance agreement is one like the policy at issue in this case. Under such an agreement, "the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 799 n.2 (Utah 1985). By contrast, a "third-party situation" arises when "the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit." *Id.*

1996). There, the court explained that the defense is grounded in the *Beck* duties:

> When confronted with a claim for benefits by a first-party insured, the insurer must *diligently* investigate the facts, *fairly* evaluate the claim, and act *promptly* and *reasonably* in rejecting or settling the claim. The terms used to characterize these duties plainly indicate that the overriding requirement imposed by the implied covenant is that insurers act reasonably, as an objective matter, in dealing with their insureds. It is entirely consistent with this overall approach to hold that when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so.

*Id.* at 465 (cleaned up).

¶14    We recognize that applying the fairly debatable defense on a motion for summary judgment can be tricky. In the typical scenario, summary judgment should be denied when a genuine issue of material fact exists. *See, e.g.*, *Reid v. All Surface LC*, 2025 UT App 134, ¶ 25, 578 P.3d 259 ("Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." (cleaned up)), *cert. denied*, 585 P.3d 48 (Utah 2026). In the context of whether a claim is fairly debatable, however, the inverse tends to be true, at least to an extent. If there is a legitimate factual question as to whether coverage exists, whether a claimant is at fault, or—as we explain in this case—the value of a claim, those questions make whether the insurer fairly evaluated the claim determinable as a matter of law. *See Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 35, 56 P.3d 524 (explaining that a claim is fairly debatable as a matter of law when the insurer raises "a legitimate factual question" as to the claim's validity); *Fire Ins. Exch. v. Oltmanns*, 2018 UT 10, ¶¶ 1, 10, 416 P.3d 1148 (legitimate factual

question as to existence of coverage); *Lund v. Truck Ins. Exch.*, 2021 UT App 64, ¶¶ 1, 26, 29, 494 P.3d 1045 (genuine factual question as to whether insured was at fault).[6]

¶15 Utah's caselaw reflects these points. Our appellate courts have determined on only two occasions that a genuine issue of material fact has existed on a fairly debatable defense in the first-party insurance context. *See Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 18, 286 P.3d 801; *Billings*, 918 P.2d at 468.[7] In every other case we have identified, the reviewing court has determined either that a district court's grant of summary judgment was appropriate or that the court *should have granted* summary judgment. *See Lund*, 2021 UT App 64, ¶¶ 1, 26, 29 (district court should have granted summary judgment because it was fairly debatable that insured was at fault); *M.A. v. Regence BlueCross BlueShield of Utah*, 2020 UT App 177, ¶¶ 1, 23–24, 479 P.3d 1152 (district court properly granted summary judgment where it was fairly debatable that the treatment sought by insured was "medically necessary"); *Oltmanns*, 2018 UT 10, ¶¶ 1, 10–11 (ambiguity in policy made it fairly debatable that coverage existed); *Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶¶ 22–23, 182 P.3d 911 (fairly debatable that fire

---

6. Of course, summary judgment would remain inappropriate if factual questions remain about whether the insurer diligently investigated a claim or acted reasonably and promptly in settling, denying, or otherwise attempting to resolve a claim. *See Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996) (grounding fairly debatable defense in *Beck* duties). But, as we explain in Parts II.A and II.C, LM offered unrebutted evidence in the proceedings below that it diligently investigated and acted promptly and reasonably in attempting to resolve Newman's claim.

7. In a third case, *Horrell v. Utah Farm Bureau Insurance Co.*, the court had denied the insurer's motion for summary judgment prior to trial, and the jury ultimately decided the fairly debatable issue. 909 P.2d 1279, 1280 (Utah Ct. App. 1996). But it is not readily clear that the insurer invoked the fairly debatable defense on summary judgment. *See id.*

insurance policy applied when insured was suspected of arson); *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶¶ 10, 23–25, 133 P.3d 428 (policy unambiguously allowed insurer to withhold funds until repairs were completed, making the claim fairly debatable); *Prince*, 2002 UT 68, ¶¶ 33–36 (fairly debatable that treatment was "medically necessary" when insurer's medical examiner opined that it was not); *S.W. Energy Corp. v. Continental Ins. Co.*, 1999 UT 23, ¶¶ 1, 15–20, 974 P.2d 1239 (fairly debatable that coverage existed where policy specifically excluded loss of oil caused by rust and corrosion when the loss was, in fact, caused by rust and corrosion); *Larsen v. Allstate Ins. Co.*, 857 P.2d 263, 266 (Utah Ct. App. 1993) (insurer's reason for failure to make payments was fairly debatable where insurer conferred with counsel, non-Utah cases "tenably support[ed]" the insurer's position, district court agreed with the insurer on its interpretation of those cases, and considerations weighed in favor of insurer's position); *Hill v. State Farm Mutual Auto. Ins. Co.*, 829 P.2d 142, 147–48 (Utah Ct. App. 1992) (denial of claim was fairly debatable where insurer reasonably believed it was entitled to subrogation); *Callioux*, 745 P.2d at 842 (denial of fire insurance claim was fairly debatable where insured had been charged with arson and bound over for trial); *see also Ellison v. Utah County*, 2009 UT App 72U, paras. 6–7 (affirming district court's grant of summary judgment in favor of defendant on fairly debatable defense); *Borg v. Workmen's Auto Ins. Co.*, 2004 UT App 74U, paras. 2–5 (same); *Wall v. Bear River Mutual Ins. Co.*, 2003 UT App 447U, paras. 5–6 (per curiam) (same); *J & C Enters., Inc. v. Mid-Continent Cas. Co.*, 2003 UT App 304U, paras. 4–7 (same); *Garcia v. Allstate Ins. Co.*, 2000 UT App 91U, paras. 2, 4 (same).

¶16  With this backdrop set, we turn to the facts of this case.

## II. Applying the Fairly Debatable Defense to Newman's Case

¶17  In her complaint, Newman alleged that she submitted "reasonable proof" of her damages and that LM offered just $1,500 to settle the claim "[w]ithout adequately investigating" it. For these reasons, she asserted, LM breached the implied

covenant of good faith and fair dealing. On summary judgment, LM made several arguments, including that its valuation of Newman's claim was "fairly debatable." The district court disagreed on this point but granted summary judgment in LM's favor on the ground that Newman had not established damages. On the facts of this case, LM was entitled to summary judgment on the basis that the claim was fairly debatable as a matter of law because LM (1) diligently investigated the facts underlying Newman's UIM claim, (2) fairly evaluated the claim, and (3) acted promptly and reasonably in attempting to resolve the claim. *See Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996); *see also Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 12, 286 P.3d 301 ("When making the determination of whether a claim is fairly debatable, a [district court] should remain mindful of an insurer's implied duties to diligently investigate claims, evaluate claims fairly, and act reasonably and promptly in settling or denying claims.").[8] We explain each conclusion in turn.

## A. LM Diligently Investigated the Facts Underlying Newman's Claim

¶18 Two weeks after Newman's counsel submitted the UIM claim, Adjuster timely responded on LM's behalf, stating that he had "fully reviewed all bills/records associated with [Newman's] case" and "fully evaluated her injury claim." He stated that he needed additional information that was not included with the claim before he could make an offer—including the amount of Newman's settlement with the at-fault driver's insurer—and he asked for that information. When Newman informed Adjuster that she had settled with the at-fault driver's insurer for the policy

---

8. To be clear, the *Beck* court did not state that this list of duties was exhaustive and in fact suggested the opposite. *See* 701 P.2d at 801 (explaining that the "implied obligation of good faith performance contemplates, *at the very least*," that an insurer will comply with the duties noted above (emphasis added)). But Newman does not suggest on appeal that LM violated any other duty in the process of investigating her claim.

limit, Adjuster offered to settle the claim. Adjuster then followed up three weeks after making the initial offer to see if Newman had a counteroffer. These facts stand in stark contrast to those in *Beck*, where the insurer rejected the claim just a week after it was submitted and "did nothing to investigate or evaluate the claim during the following month." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 802 (Utah 1985).

¶19 During litigation, LM moved for summary judgment on multiple grounds. In support of its motion, LM included the declaration from Adjuster in which he confirmed his prior statement that he had personally reviewed all of the documents that Newman had submitted with her claim. Newman did not specifically dispute that Adjuster had reviewed all of the documents. Instead, she objected to the declaration on the ground that Adjuster had "full access" to LM's "entire UIM claim file" and had disclosed only "select portions" of that file. The district court overruled the objection, and Newman does not challenge that ruling on appeal. Accordingly, Adjuster's sworn statement stands unrebutted. Moreover, even now on appeal, Newman does not point to anything concrete that Adjuster should have otherwise done.

¶20 We therefore conclude that on the record before the district court, LM established as a matter of law that it diligently investigated the facts underlying Newman's claim.

B. LM Fairly Evaluated Newman's Claim

¶21 Newman states that Adjuster "low-ball[ed]" her with a $1,500 offer.[9] But the offer must be considered in the appropriate

---

9. Newman's argument that the offer was for $1,500—which the district court apparently accepted—does not capture the context in which the offer was made. Because she had already recovered $35,000, and because she was not entitled to double recovery on her UIM claim, the offer is more properly characterized as having

(continued…)

context. Newman submitted her claim nearly a year after the crash, at which point she had received $35,000 and incurred $16,766.74 in medical expenses. In other words, her medical expenses had already been paid, and she had effectively received $18,233.26 in general damages—i.e., the difference between what she had recovered ($35,000) and her medical expenses ($16,766.74). At her deposition, Newman made clear that she was unwilling to settle for anything less than $100,000. Had she recovered $100,000, her general damages award would have been $83,233.26. Had she accepted LM's offer instead, her total recovery would have been $36,500, which would have left her with $19,733.26 in general damages. In short, because Newman's incurred medical expenses had been paid, her claim for benefits related to the value of her general damages only.[10]

¶22    General—or noneconomic—damages have long been somewhat of an enigma in the law. Utah law explicitly recognizes and accepts significant uncertainty in the determination of general damages, and this must carry over into the wide range of values that are all reasonable as a matter of law. *See, e.g., Terry v. Panek*, 631 P.2d 896, 898 n.5 (Utah 1981) (recognizing that "some degree of uncertainty is inevitable in damage determinations" (cleaned up)); *Sewell v. Xpress Lube*, 2013 UT 61, ¶ 38, 321 P.3d 1080 ("Personal injury cases almost always involve elements of damages that are incomplete or cannot be calculated with mathematical accuracy. This is particularly true where the damages sought include amounts for pain and suffering and lost

---

been for $36,500 (or $1,500 in addition to the $35,000 that she had already recovered). *See generally, e.g., Truck Ins. Exch. v. Rutherford*, 2017 UT 25, ¶ 8, 395 P.3d 143 (barring plaintiff from recovering amounts from his UIM insurer that he had already recovered from workers' compensation insurance as doing so would have constituted double recovery).

10. On this point, the arbitrator specifically determined that Newman's claim did not seek any special damages other than past medical expenses.

future wages." (cleaned up)); *Pinney v. Carrera*, 2020 UT 43, ¶ 37, 469 P.3d 970 (noting decidedly vague factors for factfinder to consider in calculating general damages such as "the nature and extent of injuries, the extent to which the plaintiff has been prevented from pursuing his or her ordinary affairs, the extent to which the plaintiff has been limited in the enjoyment of life, and whether the consequences of these injuries are likely to continue, and for how long" (cleaned up)). The determination of general damages is typically left to juries, which are, in turn, "generally allowed wide discretion in the assessment of damages." *Pinney*, 2020 UT 43, ¶ 31 (cleaned up). General damages represent the diminishment of capacity for the enjoyment of life and attempt to quantify what life would have been like without the harm done. *Id.* ¶ 36. All this is to say that there is no spectrum for which the law would expect greater variance in viewpoints or conclusions than in the realm of general damages.

¶23 Our appellate courts have confirmed that a broad spectrum of general damages is indeed possible and sustainable under Utah law. In *Pinney*, for example, this court and the supreme court sustained a jury's award of $300,000 in general damages, despite the fact that the jury also awarded no economic (or special) damages to the plaintiff. *Id.* ¶¶ 3, 43; *Pinney v. Carrera*, 2019 UT App 12, ¶ 1, 438 P.3d 902.[11] By contrast, in *Jones v. Carvell*, a mother brought a wrongful death suit against a drunk driver who had been responsible for the death of her five-year-old son and was awarded just $9,165.62 in general damages, which the Utah Supreme Court held legally sustainable. 641 P.2d 105, 106–07, 112 (Utah 1982). In other cases, our courts have frequently upheld similarly meager jury awards of general damages. *See, e.g.*, *Tingey v. Christensen*, 1999 UT 68, ¶¶ 1, 4–5, 987 P.2d 588 (upholding jury

---

11. The plaintiff in *Pinney* had asked for much more—between $419,000 and $630,000. *Pinney v. Carrera*, 2020 UT 43, ¶ 6, 469 P.3d 970. However, the supreme court was quick to "note that the amount requested by [a] plaintiff does not provide a reliable standard upon which to measure the reasonableness of a jury award." *Id.* ¶ 40 n.40.

award of a little less than $1,500 in special damages and $1 in general damages despite stipulation from both sides that the plaintiff had incurred "reasonable and necessary medical expenses" of more than $33,000); *Balderas v. Starks*, 2006 UT App 218, ¶¶ 1, 10, 15, 138 P.3d 75 (affirming jury's award of approximately $3,200 in special damages and $1 in general damages when plaintiff sought "up to $60,000 in general and special damages"). These cases demonstrate how broad and uncertain general damages awards can be. And it is this background and context that informs whether a settlement offer related to general damages has been fairly evaluated as a matter of law.

¶24 Pushing back, Newman argues that applying general damage principles from the tort context to a bad faith UIM claim constitutes "an apples and oranges comparison" because "UIM claims are contractual in nature." Newman is correct that a bad faith claim brought based on an insurer's failure to perform its duties under a first-party insurance contract sounds in contract rather than tort. *See, e.g.*, *Estate of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of Midwest*, 2003 UT App 78, ¶ 8, 67 P.3d 1012, *aff'd*, 2004 UT 104, 106 P.3d 700. But Newman's argument misses the mark because the UIM provision in her policy obligated LM to "pay compensatory damages which an 'insured' *is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle' because of 'bodily injury.'*" (Emphasis added.) In other words, by the plain terms of her policy, Newman was "legally entitled to recover" from LM what she could have recovered from the tortfeasor. *See, e.g.*, Utah Code § 31A-22-305.3(2)(a) ("Underinsured motorist coverage . . . provides coverage for a covered person who is legally entitled to recover damages from an owner or operator of an underinsured motor vehicle because of bodily injury, sickness, disease, or death."); *Berkemeir*, 2003 UT App 78, ¶ 7 (explaining that the rationale underlying caselaw related to uninsured motorist coverage applies to UIM claims); *Peterson v. Utah Farm Bureau Ins. Co.*, 927 P.2d 192, 195 (Utah Ct. App. 1996) ("If an insured is injured by an uninsured motorist, the insured may recover damages from his own insurance company

upon showing that he is legally entitled to recover those damages from the uninsured tortfeasor." (cleaned up)). For this reason, tort cases addressing general and special damages are directly on point in assessing the value of a UIM claim arising from a policy like the one at issue here.

¶25   With these principles in mind, we conclude that LM fairly evaluated Newman's claim. Had she accepted the $1,500, Newman would have received $36,500. LM's offer therefore accounted for the $16,766.74 in medical expenses that Newman incurred by the time she had submitted her claim, which, again, was a year after the accident. Where Newman was not seeking future medical expenses, the offer carried an assumption that she would have received $19,733.26 in general damages, which was roughly equal to her special damages. As set forth in detail, *supra* ¶¶ 22–23, Utah law specifically allows for wide variation in general damages awards and juries have broad discretion in their determination of those awards. And as we have explained, such principles apply in the context of a UIM claim involving general damages. *See supra* ¶ 24.

¶26   While it is certainly possible that a jury in a hypothetical tort case could have awarded Newman a far greater amount in general damages, it is at least fairly debatable that the jury would have awarded Newman special damages in an amount that was roughly equal to her general damages. Indeed, Newman testified that she thought the arbitrator's total award of $61,255.44 was "fair."[12] She also testified that she didn't seek any "mental health or emotional therapy" or otherwise start taking medication based on LM's conduct. Similarly, she acknowledged that her credit score had not been negatively affected by the accident. Under

---

12. And although it is by no means dispositive, the arbitration award confirms that LM's offer of general damages was more reasonable than Newman's because LM's offer of $19,733.26 was far closer to the $41,000 in general damages that the arbitrator awarded to Newman than was her offer of $83,233.26.

these facts, it simply cannot be said that LM did not, as an objective matter, fairly evaluate Newman's claim.

¶27 For these reasons, we conclude that the value of Newman's general damages claim was fairly debatable and that LM fairly evaluated the claim.

C. LM Acted Promptly and Reasonably in Attempting to Settle the Claim

¶28 As we have noted, when Newman filed the UIM claim, she gave LM just fourteen days to respond. Despite the short deadline, Adjuster timely responded and asked for additional information, including the amount of Newman's settlement with the other driver's insurer. On the day that Newman responded that she had settled with the other driver's insurer for the policy limit, Adjuster made an offer and expressed a willingness to negotiate the amount. And when Newman hadn't made any effort to negotiate in the three weeks after the offer was tendered, Adjuster followed up and asked whether Newman had a counteroffer. At that point, Newman opted for arbitration, as was her prerogative under the insurance agreement. When Newman elected to pursue arbitration, she asked that LM tender $1,500, and it did so promptly. Shortly after the arbitrator made its ruling, LM paid Newman the balance of what the arbitrator determined she was owed. For these reasons, Adjuster demonstrated a prompt and reasonable effort to address and settle the claim.

¶29 In resisting this conclusion, Newman asserts that "[t]he plaintiff in *Beck* was not precluded from pursuing [his] bad faith claim for 'breaking off' settlement negotiations and filing suit after [the insurer's] flat denial" and that she should not be penalized for rejecting Adjuster's "low-ball offer" here. In fact, she claims, her decision paid off because the arbitrator subsequently awarded her an amount that was "16.5 times greater" than what Adjuster offered. Setting aside the fact that Newman mischaracterizes the amount of the offer, *see supra* note 9, it is important to note that the *Beck* plaintiff did not break off

settlement negotiations. Instead, the insurer rejected the plaintiff's UIM settlement offer "without explanation." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 796 (Utah 1985). Moreover, it was only when the plaintiff did not hear from the insurer for more than a month after the rejection of his offer that he filed suit. *Id.* at 796, 802. By contrast, here it was Newman who failed to respond to Adjuster's offer. And as we have noted, Adjuster actively participated in the process and attempted to resolve the matter.[13] Moreover, LM promptly paid Newman the undisputed amounts that it owed pursuant to her UIM claim. And, as stated, it turned out that LM's offer was substantially closer to the arbitrator's general damages assessment than was Newman's take-it-or-leave-it demand for the policy limit. Consequently, Newman's attempt to analogize her case to *Beck* simply isn't persuasive.

¶30 For these reasons, we conclude that on the record before the district court, LM established as a matter of law that it acted promptly and reasonably to resolve Newman's claim.

CONCLUSION

¶31 On the facts of this case, Newman's argument that LM breached the covenant of good faith and fair dealing falls short

---

13. We think it's worth registering our disagreement with Newman's and the district court's characterization of LM's offer as a "nuisance offer" or "de facto denial" of Newman's UIM claim. As we have explained, the offer was more properly characterized as being for $36,500 rather than $1,500, and LM acknowledged that Newman was covered under the policy, made an offer within that coverage, and attempted to enter into further negotiations. *See supra* note 9. Further, the offer was not a denial. LM acknowledged that coverage existed, reviewed the relevant materials, invited Newman to produce further information, indicated (unlike Newman) that it was open to further negotiation, and when it did not hear from Newman, inquired about a potential counteroffer.

because her UIM claim was fairly debatable as a matter of law. On this alternative basis, we affirm the district court's grant of summary judgment in LM's favor.

————